INNES, Administratrix, Respondent, vs. THE CITY OF MIL- WAUKEE, Appellant.

*June 6 — July 3, 1899.*

*Master and servant: Negligence causing death: Excessive damages.*

1. Plaintiff's intestate was killed by the bursting of a cast-iron elbow, one-fourth of an inch thick and subjected to high steam pressure as well as to sudden changes in temperature. In an action to re- cover damages therefor, expert evidence was admissible upon the question as to whether the cast-iron elbow, under the pressure to which it was to be subjected, was reasonably safe, and, if unsafe, whether its dangerous condition was so obvious as to have been observable by the defendant's expert, under whose supervision it was placed, had he exercised ordinary care.
2. Plaintiff, mother of intestate, was fifty-four years of age at the time of his death. She had six other sons aged from twelve to twenty- two years. The intestate was unmarried and lived with plaintiff, whom he paid $5 per week for his board, lodging, washing, and mending. *Held,* that a recovery of $3,000 was excessive, and that in view of plaintiff's advanced age she should not be allowed to recover more than $1,500.

APPEAL from a judgment of the circuit court for Milwau- kee county: GEO. CLEMENTSON, Judge. *Reversed.*

This action was commenced May 24, 1893, to recover damages for the death of the plaintiff's intestate, caused by the alleged negligence of the defendant under circumstances to the effect that prior to July, 1891, the defendant, being desirous of increasing the capacity of the North Point pumping station, where there is a large intake which receives the water from Lake Michigan, and by means of large engines is pumped into the reservoir and mains and pipes throughout the city for the purpose of distributing such water, contracted for and purchased from the E. P. Allis Company a large pumping engine and a battery of five boilers, to be placed and used in the North Point pumping station; that these boilers were each connected in the rear with a common main steam pipe, so that the steam from all of them passed into it; that from the rear end of each boiler a wrought-iron pipe, three inches in diameter, projected down a distance of about eighteen inches, and was there screwed into a three-inch cast-iron elbow, one fourth of an inch in thickness, into the other end of which elbow a wrought-iron pipe about five feet and three inches in length was screwed; that this latter pipe ran in a nearly horizontal direction back from the boiler through an opening in a brick wall about six inches in diameter, over which was a loose iron plate, to a " T," and then dropped three feet to a drain pipe running into the sewer; that the lower end of this pipe did not rest upon anything, but was to a certain extent flexible; that there was a stop cock and valve in the pipe after it left the " T," to prevent the escape of water and steam into the sewer; that this pipe and elbow were known as the blow-off pipe, and were used for the purpose of blowing off and cleaning the boiler; that, from the time they left the boiler until they passed through the brick wall, both of the wrought-iron pipes above mentioned and the elbow were exposed, to a greater or less extent, to the heat and flames from the fire under the forward end of the boiler; that there was no cir-

culation in this pipe; that it had what is called a "dead-end;" that the blow-off pipe and cast-iron elbow were furnished by the E. P. Allis Company; that the boilers were put into use in July, 1891, and used nearly continuously until January 6, 1892, when the accident occurred; that the plaintiff's intestate was a coal passer in the employ of the defendant at the North Point pumping station; that his duties were to wheel coal to the firemen in the boiler room, to dust off the ends of the boilers, and wheel out ashes; that January 6, 1892, the cast-iron elbow of boiler No. 6 (one of the battery of five boilers referred to) suddenly and without warning burst, and the steam and hot water from the entire battery was forced into the boiler room, and the plaintiff's intestate was so badly scalded by the escaping steam and hot water that he died within a few hours thereafter.

Issue being joined and trial had, the jury returned a special verdict to the effect (1) that Alexander Innes, the son of the plaintiff, was killed January 6, 1892, while in the employment of the defendant as a coal passer in the boiler room of the North Point pumping works, by reason of the bursting of the cast-iron bend in the blow-off pipe connected with a boiler in such works; (2) that such cast-iron bend, considering the material of which it was made, its thickness, the manner of its attachment to the blow-off pipe, and its location, was not such a bend as was generally used by reputable builders of boilers which were intended to be used with the same steam pressure as was used in boilers of such works in blow-off pipes constructed by them at the time the boilers of such pumping works were constructed; (3) that by reason of the material of which it was made, and its manner of construction and connection with such blow-off pipe, such bend was defective and dangerous; (4) that such bend did burst by reason of its being defective in material and construction; (5) that the defective and dangerous condi-

tion of the blow-off pipe at said bend was so obvious that the officials of the defendant whose duty it was to supervise and inspect such pumping works could, if they had exercised such care as ordinarily prudent men in the like employment exercise under the like circumstances, have discovered the defective and dangerous condition of the pipe at said bend before the time that it burst; (6) that the officials of the defendant whose duty it was to supervise and inspect such pumping works ought, as ordinarily prudent men, to have reasonably foreseen, under all of the circumstances as they existed before the bend burst, that, as a natural and probable consequence of such bend remaining in such pipe, the bend might burst, and, by bursting, that it might probably cause injury to some person; (7) that, if the plaintiff was entitled to judgment against the defendant, then the jury assessed her damages at $3,500.

Upon motion for a new trial the plaintiff, upon the suggestion of the court, remitted $500 from the verdict; and thereupon judgment was entered upon the verdict for $3,000, with interest and costs, from which judgment the defendant brings this appeal.

For the appellant there were briefs by *Carl Runge*, city attorney, and *C. H. Hamilton*, of counsel, and oral argument by *Mr. Hamilton*.

*J. H. Stover*, for the respondent.

CASSODAY, C. J.    This case was here upon a former appeal. 96 Wis. 170. The defendant's contract with the E. P. Allis Company required that company, among other things, to construct the "steam piping to connect with engine and the necessary stop valves, all as per your [the city's] specifications." Those specifications were furnished by the city's engineer prior to the letting of the contract for the construction of the boilers. They required the boilers to be made of the best quality of homogeneous boiler plate; and the

coupons attached to the plates, to be used in the construction, to show a tensile strength of from 58,000 to 60,000 pounds, with an elongation of not less than twenty-two per cent., and a reduction of area of fifty per cent.; the boilers to be double-riveted throughout; each boiler sixty-six inches in diameter, eighteen feet long, with fifty-five four-inch tubes; steam dome twenty-two inches in diameter by forty-eight inches high. These boilers were constructed and put into position under the inspection of the city's chief engineer, who acted as special inspector for the city in charge of the work. The steel plates of the boilers were $\frac{41}{100}$ of an inch in thickness. Such connection of the boilers with the common main steam pipe, mentioned, and the cast-iron elbow, mentioned, were placed in position under such inspection and supervision of the city's chief engineer. The negligence complained of, and found by the jury, consists in the fact that such engineer allowed the E. P. Allis Company to use a cast-iron bend or elbow, of one fourth of an inch in thickness, to be attached by being screwed into the wrought-iron pipes by threads, and going to form what is known or called the "blow-off" pipe. It appears that the general specifications furnished by the defendant make no reference to blow-off pipes, and the specifications furnished by the E. P. Allis Company gave no details as to blow-off pipes whatever. Obviously, it is not the case of an appliance furnished and work performed by an independent contractor. Nor is it the case of a completed tool or appliance furnished by a reputable dealer. On the contrary, it is, so far as the elbow in question is concerned, the case of an appliance furnished by the defendant. It is conceded that the blow-off pipe was sufficient for low pressure, but it is contended that such cast-iron elbow was, to an expert, obviously, insufficient for the high pressure to which it was subjected.

There is expert testimony tending to prove, in effect, that a competent expert would have known, by looking at the

Innes vs. The City of Milwaukee.

elbow, that it was made of cast iron, and not over one fourth of an inch thick, from the flange; that, being so light and on the dead end, it would be unsafe and dangerous; that a cast iron elbow like that would be broken by three blows, while a wrought-iron elbow might be pounded a week without splitting it; that cast iron, when exposed to sudden and severe changes in temperature, has no definite limit of elasticity — no specific expansive properties that can be relied upon; that it may expand and contract without breaking, but the liability is that it will break; that it has comparatively no ductility, whereas wrought iron is malleable and ductile — it will strain and expand, but will not break, like cast iron; that the difference between them, with reference to being affected by changes of temperature in the position in which this elbow was placed, where it was exposed to the draft when the doors were open and in feeding the fire, is that cast iron has a tendency to crack by sudden changes of temperature, while wrought or malleable iron would be unaffected by the same changes of temperature; that such elbows were not considered reasonably safe under a pressure of 125 pounds to the square inch; that at the time of the explosion in question the pressure under the boiler, as shown on the gauge, was 124 pounds to the square inch. According to the dictionaries, the difference between wrought iron and cast iron consists in the fact that wrought iron is ductile and malleable, owing to the absence of carbon and other materials, while cast iron is neither ductile nor malleable, by reason of the presence of carbon and other materials. We are forced to the conclusion that expert evidence was admissible upon the question as to whether the cast-iron elbow, with the pressure to which it was subjected, was reasonably safe, and, if unsafe, whether its dangerous condition was so obvious as to have been observable by the defendant's expert, had he exercised ordinary care. We are, moreover, forced to the conclusion that the evidence is sufficient to sup-

port the verdict upon the merits. We perceive no conflict between the third and fourth findings of the jury mentioned in the statement.

The only error we find in the record is that the damages are excessive. The plaintiff was fifty-four years of age at the time of Alexander's death. She had six other sons, whose ages at that time ranged from twelve to twenty-two years. Alexander was unmarried, and lived with the plaintiff, and had his board, washing, lodging, and mending, and paid his mother therefor $5 per week. Of course, the plaintiff is only entitled to recover for her actual pecuniary loss. After carefully considering the evidence in the most favorable light for the plaintiff, and in view of her advanced age, we think she should not be allowed to recover more than $1,500.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial, but with the option on the part of the plaintiff, to be exercised within thirty days after filing the *remittitur*, to remit, in writing, from the verdict, all damages in excess of $1,500, and file such remission with the clerk of the trial court, in which event judgment is to be entered thereon in favor of the plaintiff for $1,500 damages, and the costs and disbursements in the circuit court.

MARSHALL, J., dissents.