MARSH WOOD PRODUCTS COMPANY (revived in the name of GENERAL STORAGE COMPANY), Respondent, vs. BABCOCK & WILCOX COMPANY and another, Appellants.

ZURICH GENERAL ACCIDENT & LIABILITY COMPANY and another, Respondents, vs. BABCOCK & WILCOX COMPANY and another, Appellants.

BUDNY, Respondent, vs. BABCOCK & WILCOX COMPANY and another, Appellants.

MANOL, Respondent, vs. BABCOCK & WILCOX COMPANY and another, Appellants.

*October 13, 1931—March 8, 1932.*

For the appellants there were briefs by *Miller, Mack & Fairchild* of Milwaukee, attorneys, and *Lindabury, Depue & Faulks* of Newark, N. J., of counsel, and oral argument by *Paul R. Newcomb* and *J. Gilbert Hardgrove,* both of Milwaukee.

For the respondents there was a brief by *Gold & McCann,* attorneys, and *Morris Karon* of counsel, all of Milwaukee, and oral argument by *Ray T. McCann.*

The following opinions were filed January 12, 1932:

WICKHEM, J.   The principal contentions of the defendants are as follows: first, that there is no evidence of negligence on the part of the Tube Company in the manufacture of the tubes sold to the Marsh Company; second, that assuming such negligence to have been established, there is no evidence that it was the proximate cause of the injuries to plaintiffs; third, that there is no evidence to support the finding of the jury that the tube was defective; fourth, that the rule that a manufacturer who fails to exercise ordinary care to ascertain the safety of an article sold is liable for injuries proximately resulting therefrom is inapplicable to a manufacturer of boiler tubes which are tested by the pur-

chaser after being installed; and fifth, that there is no basis for the claim by the Marsh Company of a breach of warranty.

The evidence in this case is voluminous and difficult to summarize within the limits of an opinion. The plaintiffs, in order to sustain their contention that the tube was defective and that the process of manufacture was negligent, relied principally upon the testimony of Richard S. McCaffery, Professor of Metallurgy at the University of Wisconsin. Professor McCaffery testified that he prepared samples of the tube for microscopic examination. The purpose of such an examination is to discover the texture and structure of the steel, and thereby to ascertain its soundness and homogeneity. In the specimens examined by Professor McCaffery, which were taken close to the point of rupture, he found a large number of inclusions, impurities, slag, etc., which, in his judgment, rendered the steel unsound. He also examined portions of the steel taken from points further from the rupture, and found impurities and inclusions in smaller amounts. He condemned all of the specimens which he examined as unfit for the manufacture of boiler tubes, and expressed his opinion that such a tube, considering the frequency of the inclusions, would constitute a menace to life and limb, and that it was imminently dangerous. He also gave it as his opinion that the defects were the cause of the rupture, and denied that the steel showed any evidence of having been overheated in the process of operating the boiler. From this testimony we think the jury would be entitled to conclude that the tube was defective due to the quality of the steel at the point of rupture, and that the defective steel at this point made the tube imminently dangerous to life and limb, and was the cause of the rupture. Hence, it is our conclusion that there is evidence to sustain the jury's finding to questions one and two.

The more difficult question to determine is whether there is evidence that the defendant Tube Company was guilty of

negligence in failing to discover the defective character of this tube, and whether such negligence was the proximate cause of the injuries to plaintiffs. Plaintiffs rely on four distinct items of alleged negligence.

The contention of the plaintiffs that there is evidence of negligence in the selection of the steel from which the tube was made is not sustained by the evidence. It is undisputed that the steel from which the tubes were made was either non-penalty steel or miscellaneous steel, or both. Miscellaneous steel is steel received in the form of billets which are not of uniform length. Non-penalty steel is purchased with the understanding that if it does not stand the test required it shall be returned in its entirety to the steel manufacturer. There is no evidence that either type of steel is of inferior quality.

The next contention is that there is evidence to sustain a finding of negligence on the part of the defendant Tube Company in not having an inspector at the steel plant for the purpose of inspecting steel purchased for tubes. It is extremely doubtful whether any such custom was established to the point of making it a jury question. Assuming, however, that it was so established, it is clear that there is no causal connection between the failure to have such a representative and the injuries to plaintiffs. Since the experts of the plaintiffs positively testified that only by a microscopic examination could the particular defects of this steel be discovered, it is evident that the presence of an inspector or representative would serve no purpose unless he instituted such a test, and the expert testimony is to the effect that these tests should be conducted at various stages of the process of tube manufacture, rather than at the plant of the steel producer.

It is also the contention of the plaintiffs that there is evidence from which the jury could find a failure to make a proper hydrostatic test of the tubes at the plant of the

defendant Tube Company. The hydrostatic test is a water-pressure test. The tube to be tested is put into a machine, filled with water, and subjected to a pressure of 1,000 pounds. This pressure is indicated by a gauge attached to the machine. The workman who conducted these tests was on the stand and testified to the process of hydrostatic inspection. He did not speak English very well, and his testimony is consequently not as satisfactory as could be desired. He stated on direct examination that he put the tube into the machine, filled it with water, then shut off the water and put on the pressure. He stated that he left the machine on for a couple of seconds, and if the tube leaked he put a chalk mark on it. It is the contention of the plaintiffs that his testimony shows that he could not read or write; that he worked on a piece-work basis, tested the tubes for only a second, and took only a couple of seconds to make the complete test of the tube. This is not a fair comment upon his evidence. As stated before, he evidently had some difficulty with the language but stated that he could read figures on the gauge, and that he left the tube under pressure for a couple of seconds. It is true that he was led to say that the more tubes he inspected the more money he got for inspecting them, and that he was anxious to make as much money as he could to support his children. This falls considerably short of the evidence necessary to establish negligence in inspecting these tubes. Professor McCaffery testified that making a hydrostatic test is about as simple as taking the air pressure on an automobile tire; that upon applying 1,000 pounds pressure the water would spurt through a hole in the tube the size of an ordinary knitting needle. Evidently the process was a simple one and one that could be carried through rapidly and efficiently, and, according to Professor McCaffery, one that, even if carefully carried out, would not disclose such defects as were the cause of this rupture. So we think it is clear that there is

no evidence of negligence in conducting the hydrostatic test, and that if there were, there would be no causal relation between such failure and the injuries sustained.

The next question is whether the evidence sustains the finding of the jury that defendants were guilty of negligence in failing to subject the steel used in the tube to a microscopic examination for the purpose of discovering the presence of inclusions of slag in dangerous quantities. Professor McCaffery stated that practically the only way of determining the soundness of the metal is by use of the microscope. He further stated that good practice in 1926 required a metallographic or microscopic examination of the steel out of which it was proposed to make boiler tubes. He stated that this examination should be made from the billets of steel from which the tubes are made, and that thereafter further examinations should be made successively through the process of manufacture, the number to depend upon the results of the earlier tests. He stated that this examination should be made of the part of the tube that is nearest and most representative of the upper part of the ingot from which the tube is made. He testified that he knew of no single manufacturer or seller of tubes who incorporates this examination in the specifications he uses in the manufacture of boiler tubes, and that he knew of no tube manufacturer who makes such an examination of every heat of steel that he converts into tubes. The testimony of Professor Scott McKay, of the University of Wisconsin, an expert metallurgist, was substantially to the same effect.

Is this evidence sufficient to permit the jury to find that the failure to institute the metallographic examination by defendants constitutes negligence? We have concluded that it is sufficient. It represents the judgment of recognized experts in the field as to the requirements of the art in which they are experts, and it is our conclusion that the jury might accept the opinions as establishing the reasonableness of instituting this test and the necessity for its institution in order

to discharge a duty of due care. The fact that it was not the practice of tube manufacturers generally to use these tests, and that such an examination is not incorporated in the specifications of the American Society of Mechanical Engineers, or required or provided for in the Wisconsin Boiler Code, is certainly strong evidence against the position taken by Professors McCaffery and McKay, but it does not dispose of their evidence as a matter of law. The fact that the custom of manufacturers generally was followed is evidence of due care, but it does not establish its exercise as a matter of law. Obviously, manufacturers cannot, by concurring in a careless or dangerous method of manufacture, establish their own standard of care. *Boyce v. Wilbur Lumber Co.* 119 Wis. 642, 97 N. W. 563.

It is urged by defendants that this case comes within the doctrine of *Bandekow v. Chicago, B. & Q. R. Co.* 136 Wis. 341, 117 N. W. 812; *Merton v. Mich. Cent. R. Co.* 150 Wis. 540, 137 N. W. 767; *Zartner v. George,* 156 Wis. 131, 145 N. W. 971, and *Stasek v. Banner Coffee Co.* 164 Wis. 538, 159 N. W. 945. In the *Bandekow Case* it is said:

"It has been held in a long array of cases that proof that the conduct of a defendant coincided with the customary method of doing the business by others under similar circumstances excludes the inference of negligence. . . . True, an exception is noted in the authorities, and equally well established, to the effect that a custom which is so obviously dangerous to life and limb as to be at once recognized as such by all intelligent persons cannot be justified under this rule."

It is evident that the effect of the expert testimony in this case is to characterize the customary method of manufacture as dangerous and negligent, and to warrant the jury in finding that customary standards did not meet the requirement of due care. Having decided that there is evidence from which the jury could conclude that failure to institute this test constituted negligence, in view of the progress of the art in 1926, it becomes necessary to consider whether the

jury could find this negligence to have been the proximate cause of plaintiff's injury.

It is again necessary to refer to the evidence of Professor McCaffery. The ingot is a part of a heat of metal. This ingot is made into blooms, and blooms are made into billets, which are lengths of metal that have been put through a rolling process. The tubes are manufactured from the billets. Professor McCaffery states that the microscopic examination should be made from the upper part of the tube nearest and most representative of the upper part of the ingot from which the tube is made. It cannot, for the obvious reason that it will destroy the tube, be made from any portion of the tube or billet or bloom except from the end. Professor McCaffery does not state that an examination of the end nearest and most representative of the upper part of the ingot from which this tube was made would have disclosed enough inclusions to warrant the discarding of the steel, nor did he make any examination upon which such an opinion could be based. From this it is contended that there is no basis for the jury's conclusion that negligence in failing to institute a metallographic test was a cause of the injuries to plaintiffs. This contention necessitates a further analysis of the testimony of Professor McCaffery. We think that, fairly construed, his testimony is to the following effect: first, that the discharge of the obligation to exercise due care required the institution of metallographic examinations; second, that the purpose of such an examination is to determine not the quality of steel in any particular tube, but the quality of steel in the heat from which it is proposed to make the tubes. He states that a number of such examinations should be made, the number to vary with the findings in the earlier examinations, and it is a fair conclusion that he means to state that such an examination, properly carried out, would disclose to the manufacturer the defective quality of a particular heat of

steel. This being true, it follows that proximate cause would be established at least as a question for the jury, provided the evidence is sufficient to establish the further fact that the tube in question was made from an inferior or unusually impure heat of steel. It is manifest that no such examination as that proposed by Professor McCaffery would be effective to discover, except by chance, isolated and occasional inclusions so concentrated as to constitute defects. It would, if his testimony is correct, be effective to disclose to the manufacturer a quantity of steel unfit as a whole for tube-making purposes. If it can be concluded that the evidence of Professor McCaffery and Professor McKay, which characterized this steel as wholly unfit for use in making tubes, was intended by them to be limited to the minute particles which formed the subject of their metallographic tests, then this verdict cannot be said to be sustained by the evidence, because the testimony as so construed would fall short of a general condemnation of the steel employed in making the tubes. If, on the other hand, their characterization of the steel as dirty and unfit for use was intended to apply generally to the steel which went into the manufacture of the tubes on this heat of steel, it is evident that the last link in the chain of causation has been covered by their testimony.

A careful examination of the testimony leads us to the conclusion that the testimony of Professor McCaffery and Professor McKay does amount to a condemnation of the steel from which the tubes were made, and is not limited to the small portions of steel which have been examined under the microscope. Professor McCaffery says:

"It is my opinion that the steel, pictures of which are preserved in plaintiff's exhibit 4, is not suitable for use in boiler tubes. That opinion is based on the opinion I have acquired after very many years of study of steel for all purposes and examination of various steel that I know have

failed under conditions I have produced myself in certain cases of their failure and the incorporation of that experience over a great many years. . . . That opinion is formed because of things which I observed in that steel and which are illustrated by what appears in plaintiff's exhibit 4."

This is even more apparent from the testimony of Professor McKay. He was asked the question: "I will ask you whether or not in your opinion the steel with the inclusions such as shown in plaintiff's exhibit 5, is steel from which to make tubes for boilers?" Answer: "I do not want to limit my opinion to the four pictures shown here, because I want to include my visual examination, and if I may include that I consider that unfit for such use."

From this it is our conclusion: first, that the expert testimony points to the necessity of metallographic examinations in discharge of the duty of due care; second, that the evidence is such as could warrant the jury in finding that such an examination, properly carried out, would have resulted in the rejection of the heat of steel from which this tube was made; and third, that the tube was actually made from an impure and unfit quantity of steel. It follows that the jury were warranted by the evidence in finding both negligence and proximate cause with respect to the necessity of metallographic examinations.

It is further contended by the defendants that the rule that a manufacturer who fails to exercise ordinary care to ascertain the safety of an article sold is liable for injuries proximately resulting therefrom, is inapplicable to a manufacturer of boiler tubes which are to be tested by the purchaser after being installed. It is unnecessary in this opinion to discuss in any detail the tort liability of manufacturers to persons, other than the vendee, who are injured by negligently manufactured articles. The subject has been fully discussed in *Flies v. Fox Bros. Buick Co.* 196 Wis. 196, 218 N. W. 855. In this case the doctrine of *Mac-*

Pherson v. Buick Motor Co. 217 N. Y. 382, 111 N. E. 1050, was followed. In the *MacPherson Case* the court, speaking through Mr. Justice CARDOZO, stated:

"If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

These decisions represent the modern tendency of courts with reference to the tort liability of the manufacturer for articles negligently constructed. See Bohlen, Liability of Manufacturers, 45 Law Quarterly Review, 343; Feezer, Tort Liability of Manufacturers, 10 Minn. Law Review, 27; Green, Rationale of Proximate Cause, p. 28; notes 15 Iowa Law Review, 110; 14 Minn. Law Review, 306; 29 Harvard Law Review, 66.

It can hardly be questioned that a boiler tube falls within the class of articles which, if negligently manufactured, will be imminently dangerous to life and limb. It is contended by the defendants that the *MacPherson Case* imposed a liability only upon a manufacturer whose article was to be used without new tests. However, the opinion in that case makes it very clear that the court does not mean definitely and finally to limit the doctrine. In the *MacPherson Case* the goods were sold to be used without new tests, and the court went no further than was necessary to dispose of the facts before it, leaving to the future a consideration of any further extensions of or limitations upon the doctrine. Hence, we think the case is not authority for the proposition that in every case where new tests are to be made by the purchaser, the manufacturer is relieved of any liability to those other than the vendee, for negligent construction.

However, even if such a limitation be proper, it would not be applicable here. Assuming that the negligence of the defendants consisted in a failure to institute microscopic examinations of the steel, and assuming, further, that such an examination was the only means of discovering its unsoundness, it could hardly be urged that the fact that the vendee was expected to make hydrostatic or pressure tests, all of which by assumption are wholly inadequate to discover the unsoundness of the steel, would operate to limit or destroy the liability of the manufacturer.

It is further contended by the defendants that the Marsh Company has no claim based on breach of warranty, because no notice of such claim was given within a reasonable time as required by sec. 121.49, Stats. This section provides that "if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor." The rupture of the tube occurred on September 28, 1926. Thereafter the Marsh Company ordered from the Tube Company twenty-eight new tubes to replace the ruptured tube and the other tubes in the front bank which had become bulged and snarled as a result of the explosion. These tubes were shipped by the Tube Company to the Marsh Company and were installed. The Marsh Company paid for the tubes and made no claim or complaint against the Tube Company or the Babcock & Wilcox Company for breach of warranty or negligence, except such claim as was involved in the commencement of the present action on June 14, 1928,—more than one year and eight months after the accident. On the part of the defendants it is contended that such delay is unreasonable.

We have concluded that this contention is sound. Under the section relied upon, the purchaser has neither a right of action for the breach of a promise or warranty in the contract, nor a defense to an action for the purchase price,

unless the required notice has been given. Uniform Sales Act, Annotated, vol. 1, p. 289; *Trimount Lumber Co. v. Murdough,* 229 Mass. 254, 118 N. E. 280; *Moore v. Foss & Co. Inc.* 18 Fed. (2d) 635. Even the fact that the seller knew of the facts constituting the breach does not render it unnecessary for the buyer to give the required notice, since the notice required is not of the facts concerning the breach, but of the buyer's claim that they will constitute a breach. *American Mfg. Co. v. U. S. Shipping Board Emergency Fleet Corp.* 7 Fed. (2d) 565. Hence, this provision is not in the nature of a statute of limitations, but the notice is imposed as a condition precedent to the right to recovery. Such a notice given after commencement of the suit is held to be ineffective. *Henderson Tire & R. Co. v. Wilson,* 235 N. Y. 489, 139 N. E. 583. The notice must advise the seller that the buyer is looking to him for damages. *Wildman Mfg. Co. v. Davenport Hosiery Mills,* 147 Tenn. 551, 249 S. W. 984; *Bodek & Son v. Avrach,* 297 Pa. St. 225, 146 Atl. 546; *Chess & Wymond Co. v. La Crosse Box Co.* 173 Wis. 382, 181 N. W. 313. There is no claim that any notice other than the commencement of this suit was ever given to the defendant Tube Company, and since this was a condition precedent to a recovery for breach of warranty, and a part of plaintiffs' case, there is no basis for recovery upon the breach of warranty.

However, it having been determined that the jury were justified in finding that there was negligence in the manufacture of the tubes, and that this was a proximate cause of the explosion and injury, there is no reason to disturb the judgment in favor of the Marsh Wood Products Company, provided the doctrine which establishes defendants' liability for personal injuries properly extends to the destruction of property as well as injuries to persons. Upon this question there is a conflict of authority. The New York court has expressly refrained from passing upon the question. *Pine Grove Poultry Farm v. Newtown B.-P. Mfg. Co.* 248 N. Y.

293, 162 N. E. 84. We think, however, that at least where the article, if negligently manufactured, will be imminently dangerous to human safety, the liability should extend to property damage in all cases where a causal connection can be established between the defect which constitutes the article a menace and the property damage. See 14 Minn. Law Review, 306; 10 Minn. Law Review, 27; 45 Law Quarterly Review, 343; *Skinn v. Reutter,* 135 Mich. 57, 97 N. W. 152; *Mazetti v. Armour & Co.* 75 Wash. 622, 135 Pac. 633.

It is contended that the damages are excessive. We have carefully considered this matter and find that the contention is without merit. We think there would be no profit in further extending this opinion by a discussion of each of the items of damage objected to. Hence, we will confine our consideration to the largest item of damage—the award to Victor Kakolius of $15,000. Mr. Kakolius received severe second and third degree burns to his chest, throat, and hands. He was confined to the hospital for a period of about three months, during the first three weeks of which he could not move at all. As a result of the burns he was compelled to have an operation for the removal of the thyroid gland and later a plastic operation on his neck for the reason that one of the scars upon his neck was so contracted as to force his head out of its normal position. He was confined to his home for a year after his return from the hospital. His hands were very severely burned, and in healing large thick scars have been left upon his hands. The tissues of these scars underneath the skin are raised, and the tissue itself is thinner than normal skin and has an almost parchment-like structure. There were still, after four and one-half years, scabs on the fingers which frequently broke down and opened. He had had every sort of treatment to bring the condition of his hands and neck to normal, but the conditions are permanent. Due to the

scars on his hands he is incapacitated for manual labor of the type for which he is fitted, the scars interfering with his ability to lift, and the tissues of the scars having a tendency to break down and cause open sores. His hospital bill amounted to $600, and he has lost about four and one-half years of work. His wage scale was $1,600 annually. We have come to the conclusion that it is clear from the record that Mr. Kakolius has been subjected to great expense and to a substantial wage loss; that he has suffered excruciating pain; that he will always be subjected to humiliation and disadvantage by reason of the scars and mutilation of his hands and body; that he will be unable to earn his living at manual labor, or at least that he will be greatly impeded in so earning his living. He is a young man, and we think it was within the province of the jury to find that over the period of years which constitutes his normal expectancy, he would sustain in pain, suffering, the requirements for medical treatment, and in wage loss a very large sum of money, and that this sum, taken together with what he had sustained in pain, suffering, wage loss, and hospital expenses, could be set at $15,000 without evidencing passion and prejudice.

The contention that the General Storage Company is not entitled to have revived in its favor the action which was commenced by the Marsh Wood Products Company is without merit. The latter company was dissolved January 25, 1928. The General Storage Company is its sole stockholder. This action was commenced in June, 1928, and as a result of unavoidable delays was not reached for trial until January 14, 1931. The trial was in progress when the three-year period provided by sec. 181.02 for the prosecution and defense of actions against a dissolved corporation expired. Upon an affidavit of H. W. Marsh, president of the Marsh Wood Products Company, that the General Storage Company was the sole stockholder and that all

creditors had been paid, the motion to revive the action in favor of the General Storage Company was granted. Assuming that this cause of action could survive the legal death of the corporation, it would clearly be vested in the sole surviving stockholder. *Lindemann v. Rusk,* 125 Wis. 210, 104 N. W. 119. We think it clear that such an action would survive the dissolution under the provisions of sec. 331.01 as an action to recover "for all damage done to the property rights or interests of another." The survival of actions in favor of a corporation is determined by the statutes applicable to survival of actions in general. 8 Fletcher, Cyc. Corp. 9196. The cause of action being one of the class that survives, it is consequently assignable and is vested, after the three-year period reserved for liquidation, in its sole stockholder. The provisions of sec. 269.23, which prescribes the manner in which actions may be revived or continued, confers the right so to revive or continue upon "any person who shall be entitled," etc. Under the provisions of sec. 370.01 the word "person" must be held to include corporations and to entitle the General Storage Company to have the action revived. It is considered that the court did not abuse its discretion in reviving the action.

It is further claimed that the court erred in refusing to admit for identification certain microscopic photographs of steel taken from a text-book and which it is claimed were identified by Professor McCaffery as having gone through the critical range of temperature rapidly. The purpose in offering these photographs was to permit the jury to compare the structure of the steel as dissolved by them with that of the steel from the boiler tubes. It is defendants' claim that this would have disclosed that the structures were the same, and would have led to the conclusion that the tube had been overheated. We think the exhibit was properly excluded. Professor McCaffery expressly declined to recognize the pictures as fairly representative of the

quenched structure of low carbon steel. Further than this, the pictures were not admissible under the rule laid down in *Bell v. Milwaukee E. R. & L. Co.* 169 Wis. 408, 172 N. W. 791; *Zoldoske v. State,* 82 Wis. 580, 52 N. W. 778; *Waterman v. Chicago & A. R. Co.* 82 Wis. 613, 52 N. W. 247, 1136, to the effect that medical and scientific books are not admissible in evidence.

Error is claimed because the court struck out the testimony of Fred L. Dornbrook, in response to a motion based upon his claimed incompetence as an expert in metallurgy. Under the rule in *Northern Supply Co. v. Wangard,* 123 Wis. 1, 100 N. W. 1066, the ruling cannot be disturbed. The court there said: "The questions in that regard, however, relate to mere competency, and, therefore, the trial judge's determination thereof, within all reasonable limits, is supreme."

Upon a careful examination of the record we do not think it can be said that the trial court abused its discretion in excluding the testimony. Furthermore, there was ample testimony on behalf of the defendants to the same effect as that offered by Dornbrook, and if it were to be held error, we could not say it was prejudicial.

Error is also predicated upon the admission of evidence on the part of Professor McCaffery that the tube, because of inclusions, was a menace to life and limb. The objection is based upon the contention that the issues to which this question relates were for the jury, and that the witness was erroneously permitted to give an opinion concerning one of the ultimate facts in issue. While it is difficult to harmonize all that has been said upon this subject by this court, we think it settled that the opinions of witnesses which relate to matters of science or to skill cannot be objected to merely because they cover one of the ultimate facts to be determined by the jury. *Daly v. Milwaukee,* 103 Wis. 588, 79 N. W. 752; *Innes v. Milwaukee,* 103 Wis. 582, 79 N. W. 783;

*Benson v. Superior Mfg. Co.* 147 Wis. 20, 132 N. W. 633. Consequently, it is our conclusion that the evidence was admissible, and it is unnecessary to decide whether the form of the question to which the opinion responded was proper, there having been no objection to the form of the question.

It is further claimed that the defendant Babcock & Wilcox Company, being neither a manufacturer nor seller of the tubes, is not liable in this action. We have carefully examined the testimony and have come to the conclusion that the evidence clearly points to the fact that the Tube Company was a mere agent of the Babcock & Wilcox Company, and that the latter company is liable under the doctrine of *respondeat superior.*

It is next contended that error was committed by the court in refusing to submit to the jury questions as to whether the tube was overheated at the time of the rupture, and whether the Marsh Company was negligent in operating the boiler. In this case the question was whether the tube exploded by reason of defects in the tube or by reason of its having been overheated in the process of operation. In so far as the question was, which of these two factors was the cause of the explosion, we think there was no necessity for submitting the question relating to overheating together with the question of the tube's defective structure. Upon this phase of the issue, the question being which of the two was *the* cause, the finding that the tube was defective and that it was the cause of the rupture would exclude overheating as the cause. Consequently, we think the failure to submit the question as to whether the rupture occurred as the result of overheating need not have been submitted because it was sufficiently covered by the question relating to the causal connection between the defects of the boiler and the rupture. In so far as the overheating may be claimed to have been a contributing cause, its submission to the jury would be as a part of the issue of contributory negligence.

In question fifteen the court submitted the question whether any want of ordinary care on the part of the plaintiff Stefan Budny proximately contributed to produce his injury. Since Mr. Budny was an employee of the Marsh Company, in charge of the boiler at the time of the explosion, and the only person who could have been charged with any actual negligence in the operation of the boiler, we think the issue of contributory negligence was properly covered by a question as to his conduct. If the jury had found Budny to have been negligent, the negligence of the Marsh Company would have followed as a matter of law. Consequently, the court submitted to the jury all of the facts necessary for a determination as to the negligence of the Marsh Wood Products Company, and we think there was no prejudicial error.

A more serious question arises with respect to the submission of this case as a whole. As has heretofore been stated, the first question of the special verdict required the jury to find whether the tube was so defective by reason of inclusions as to render it imminently dangerous to life and limb when used under allowable working pressure. This question was proper both in form and substance. Having submitted to the jury the question whether the tube was actually defective, and whether the defect was the cause of the rupture, it next became the duty of the court to submit to the jury the question whether the defendant was negligent with respect to the manufacture of the tube, in that it failed to subject the heat of steel from which the tube was manufactured to a metallographic or microscopic inspection. The question, in order to conform to the evidence offered, is not whether this tube or all the tubes should have been subjected to this test, because the evidence is clear from plaintiff's own experts that no such obligation can be contended for. Question seven asked the jury to find whether the defendant Tube Company failed to exercise ordinary care "with

respect to a microscopic inspection of the tube in question." In our judgment this does not properly present to the jury the issues made by the evidence. There was no obligation to subject this tube to a microscopic inspection, or to inspect all the tubes, but merely an obligation to establish by a suitable number of these tests the fitness of a heat or quantity of steel for the purpose of making tubes. We think the court submitted to the jury for determination a question that assumed a broader duty upon the part of defendants than the evidence called for; at least it is clear that the evidence does not sustain a finding that the defendant was negligent for failure to subject *this* tube to a microscopic examination, or, if it was, that such negligence was the cause of the injuries. While it may be contended that this represents too meticulous a requirement, it should be pointed out that the question whether the evidence was sufficient to enable the jury to find negligence for failure to institute this test was a close question, and since we have sustained this as a jury question, both as to negligence and proximate cause, because the evidence seems to us to warrant the jury in finding an obligation to institute the test to determine the fitness of the steel out of which the tubes were made, we think there is special need for accuracy in limiting the issue. We further think, in view of the ground upon which a fact question has been sustained in this case, that in addition to the question there should have been submitted to the jury the question whether the steel of which this tube was made was reasonably fit for the purpose. As heretofore stated, it is perfectly possible, under the theories advanced by the plaintiff's experts, that a proper metallographic examination would not disclose the defective quality of a particular tube because of the fact that these particular tubes had a large number of inclusions or more concentrated inclusions than the general run of the heat of steel. Consequently, it was for the jury to find specifically, we think, that this tube

was made of impure or unfit steel, and this question should have been submitted.

We think the verdict in the form submitted did not respond to the only issues of fact, and that this resulted in prejudice to the defendants. This compels a reversal of the judgment.

*By the Court.*—Judgments reversed, and cause remanded with directions to grant a new trial.

Rosenberry, C. J. (*dissenting in part*). I am of the opinion that there is no evidence in the record upon which the defendants can be charged with negligence on the ground that they failed to subject the steel used in the manufacture of the tubes to a microscopic examination for the purpose of discovering the inclusion of slag in dangerous quantities. The evidence clearly shows that in the manufacture of steel, no matter what degree of care is employed, such inclusions may occur; that when they do occur they render such an article as a boiler tube highly dangerous is apparent.

I subscribe fully to the doctrine that a practice or method which is obviously negligent and dangerous affords no protection to a manufacturer who employs it although it may be in accordance with the custom of the business. Nothing of that kind, however, appears in this case. The witness who testified to the evidence upon which the verdict is sustained also testified that, so far as he knew, nowhere in the world was it employed in practice. His standard therefore appears to me to be theoretical, unworkable, and impracticable, and conformity to it would be the exercise of the most extreme caution and beyond anything reasonably to be expected of a manufacturer in the exercise of ordinary care.

I am of the further view that, even if it be conceded that the exercise of ordinary care requires such an examination, there is nothing in the evidence which shows that such an

examination would probably have disclosed the presence of an inclusion either in this tube or in the steel from which it was manufactured. Failure to make the examination was not the proximate cause of plaintiffs' injuries. The expert himself examined nothing but the metal in and about the break, he took no specimen from the ends of the tube, and it appears that had he done so it would not have disclosed the presence of this inclusion. The tubes are subjected in the course of manufacture to the hydrostatic test and are by the order of the Industrial Commission required to be tested preparatory to being put into use for the very purpose of discovering whether or not they are structurally weak. It appears that this tube was subjected to such tests and no evidence of a weakness of any kind was disclosed. I am unable to concur in the conclusion reached upon these points, but as to the other propositions I do concur.

Motions for a rehearing were denied, with $25 costs, on March 8, 1932.