FISCHER, and wife, Plaintiffs-Respondents and Cross-Appellants, V. CLEVELAND PUNCH & SHEAR WORKS COMPANY, and another, Defendants-Appellants and Cross-Respondents.†

Supreme Court

*No. 76–337. Argued May 29, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 280.)

† Motion for reconsideration denied, with costs, on August 27, 1979.

For appellant Cleveland Punch and Shear Works Company there were briefs by *Roger L. Wiedabach* and *Prosser, Wiedabach & Quale, S.C.,* of Milwaukee, and oral argument by *Roger L. Wiedabach.*

For appellant Allen-Bradley Company there were briefs by *Thomas O. Kloehn, Peter W. Bunde, O. Thomas*

*Armstrong* and *Quarles & Brady* of Milwaukee, and oral argument by *Mr. Kloehn.*

For respondents there was a brief by *John K. Brendel* and *Brendel, Flanagan & Sendik, S.C.,* of Wauwatosa, and oral argument by *John K. Brendel.*

WILLIAM G. CALLOW, J. This is an appeal from a judgment awarding damages to the plaintiff for injuries suffered when the ram on a punch press came down on his arm. The defendants challenge the sufficiency of the evidence to support the jury verdict that the manufacturer of the press and the manufacturer of the foot control were causally negligent. The defendants also maintain that it was error to submit both negligence and strict liability questions to the jury and that the jury verdict was inconsistent in that it found the prodducts not unreasonably dangerous but did find the defendants causally negligent in the design of the machine. Other issues are presented. We affirm the judgment.

Richard Fischer was employed by Capitol Stampings Corporation (Capitol). Following his apprenticeship in tool and die making, he worked in the tool room for several months where he prepared the dies for the presses. The dies were then placed on the presses by "setup men." Fischer had no instruction in the operation of the presses. In the fall of 1970, at age twenty-three, he assumed supervisory duties in the shop on a trial basis. This was in preparation for a possible career as a sales engineer for Capitol, according to the testimony of Capitol's president.

On January 28, 1971, one of the machine presses, manufactured by The Cleveland Punch and Shear Works Co. (Cleveland), was outfitted with a repiercing die to enlarge the hole in the center of the sprockets being manufactured. The top part of the die was clamped to

the ram; the bottom attached to the bolster plate. When activated, the ram would descend, punching out a slug creating a larger hole in the sprocket being manufactured. The punched out slug would fall through a hole which had been cut into the bolster plate. At about 9 a.m. the operator of the machine complained to Fischer that the slugs were accumulating around her feet. The setup men were busy, so Fischer agreed to help her clear away the scrap slugs. She said she had pressed the stop button and was going to the restroom. Fischer also pressed the stop button to make sure the machine was off. As he began to look at the machine, his supervisor yelled to him. Fischer walked over to him so that he could hear what he was saying. His supervisor told him the machine was on. When he replied that he had shut it off, the supervisor said that he should not put his hand in the machine because the flywheel was still running. Fischer talked with another man for a few minutes and then ascertained that the flywheel was stopped. He put his arm through the die cavity into the bolster plate and moved the slugs around when he noticed the ram sliding down upon his arm. His arm was almost severed about $2\frac{1}{2}$ inches above the elbow; the lower portion remained attached by a small piece of skin and by the radial nerve. The lower arm was surgically reattached.

Fischer and his wife brought a products liability action against Cleveland, the machine's manufacturer; L. L. Richards Machinery Company, Inc., its distributor; Allen-Bradley Co., the manufacturer of a foot switch installed on the press; and Holt Electric Motor Co., the firm installing the switch. The complaint alleged causes of action in strict liability and negligence against Cleveland and Allen-Bradley. Against Richards and Holt, Fischer's actions were grounded in negligence; and at the close of the case, the trial court dismissed the actions against Richards and Holt.

The trial court instructed the jury on the principles of negligence and of strict liability and submitted a special verdict inquiring as to both theories. The jury found the press and foot switch not unreasonably dangerous when they left the possession of Cleveland and Allen-Bradley, respectively, but found both defendants negligent as to design and construction. The jury apportioned the negligence as follows: 53 percent to Cleveland, 22 percent to Allen-Bradley, 13 percent to Capitol, and 12 percent to Fischer. The jury found that Fischer suffered damages of $120,000 for pain, suffering, and disability, and $120,000 for loss of earnings and earning capacity. The court fixed Fischer's medical expenses at $17,333.95. The jury found that Fischer's wife suffered damages of $7,500 for loss of her husband's society and companionship.

Postverdict motions were denied. From a judgment entered on the verdict, the defendants appeal. Fischer cross-appeals, contending that there was insufficient evidence of his contributory negligence to support the verdict and that the court should have increased the jury's finding as to his lost earnings and earning capacity.

The parties raise the following questions for review:

(1) Is there credible evidence to support the jury's verdict?

(2) (a) Did the trial court err in submitting both negligence and strict liability issues to the jury? (b) Was the verdict inconsistent?

(3) Did the court err in failing to change the jury's finding as to damages for loss of earnings and earning capacity?

(4) Did the trial court commit reversible error in (a) allowing Fischer's counsel to examine Allen-Bradley's expert adversely and permitting Allen-Bradley to recall the expert, (b) refusing to grant a mistrial based on

the conduct of Fischer's counsel and wife during trial, (c) allowing a dictionary to be sent to the jury room?

The standard of appellate review of the sufficiency of of the evidence to support a jury verdict has been stated as follows:

"In general, of course, this court will view the evidence in the light most favorable to the verdict, and affirm if there is any credible evidence on which the jury could have based its decision, particularly where the verdict has the approval of the trial court. *Toulon v. Nagle* (1975), 67 Wis.2d 233, 242, 226 N.W.2d 480. The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury. *Valiga v. National Food Co.* (1973), 58 Wis.2d 232, 244, 206 N.W.2d 377; *Calero v. Del Chemical Corp., supra*, 68 Wis.2d at 508."

*Roach v. Keane,* 73 Wis.2d 524, 536, 243 N.W.2d 508 (1976).

A cause of action in negligence requires proof that the defendant failed to exercise ordinary care and that the act or omission complained of was the cause of the plaintiff's injury. *Greiten v. La Dow,* 70 Wis.2d 589, 601, 235 N.W.2d 677 (1975). Ordinary care involves the concept of foreseeability; if in the exercise of ordinary care a reasonable person would have foreseen injury as a consequence of his act, the act is negligent. *Id.* at 602; *Osborne v. Montgomery,* 203 Wis. 223, 234, 234 N.W. 372 (1931). The question of cause is a factual inquiry asking whether the defendant's negligence was a substantial factor contributing to the injury. *Merco Distributing Corp. v. Commercial Police Alarm Co.,* 84 Wis.2d 455, 458–59, 267 N.W.2d 652 (1978). A finding of a causation must have a reasonable basis in the record; it cannot be based on conjecture. *Id.* at 460.

Fischer was the only witness to the accident. The evidence showed that in order for the ram to descend the clutch had to be energized. The evidence supports a conclusion this probably occurred when Fischer inadvertently stepped on the machine's foot control. Assuming the flywheel was dead, as Fischer testified, and that the ram descended upon his tripping the foot switch, the air pressure in the counterbalance system must have been insufficient to balance the ram, according to the testimony of expert witnesses Rice, Milhaupt, and Richardson. The air pressure in the system on the press was set at a predetermined level by a regulator. If the pressure in the company's lines were inadequate, the machines could not have been run by the operators. Capitol's president testified that, because company production consisted of many "short runs," the regulators on the presses were set at the maximum to obviate the necessity of constantly readjusting them; but he also testified that he did not check the regulator following the accident. This supports a conclusion that the air pressure regulator on the press in question was set too low or did not work to sufficiently counterbalance the ram as this machine was set up for this particular job.

Fischer's experts identified three design aspects which a jury might reasonably have found to constitute a lack of ordinary care.

First, the machine lacked an air pressure counterbalance switch. If the pressure of the counterbalance system fell below a fixed level, such a switch would automatically interrupt the supply of electricity to the control circuit, preventing activation of the clutch. James Rice, an engineer who worked in the industrial standards department at Allen-Bradley, and Professor Richardson, a Marquette University professor of mechanical and electrical engineering, termed the lack of an automatic switch a design defect constituting an unreasonable danger to the machine's user. Air pressure

switches were available in 1968, the year the press was sold.

Second, the machine utilized two independent electric circuits. One operated the motor; the other, the brake and clutch. By pressing the "stop" button, Fischer turned off only the electric supply to the motor. The electric supply to the brake and clutch was controlled by a switch on the control panel labeled simply "off/on." At the time of the accident, this switch was in the "on" position. When the machine operator and Fischer each pressed the stop button, the power to the motor would be off, but the control circuit would remain active. The machine operator testified that at no time during her fourteen years with Capitol had anyone told her about the second switch. She said that, when she pushed the stop button, she believed the machine was dead. Rice and Richardson testified that the failure to interlock the two circuits, so that both circuits would be opened when a single "stop" button was pressed, was a design defect creating an unreasonable danger. Cleveland provided no instructional material with its presses; there were no plates or decals to explain operation of the control panel.

Third, the machine was designed to be operated in the "short stroke" mode. This means that pressing the switch once caused the ram to go through an entire cycle. The "long stroke" mode requires continuous pressure on the switch to move the ram; once the foot is lifted from the control, the ram stops.

We note that any determination that this latter feature caused Fischer's injury is speculative because for the "long stroke" mode to be of any protection to Fischer he would have had to remove his foot from the switch before the ram hit his arm. There is no evidence that he did so; in fact, he was not even aware he stepped on the switch. The jury was, however, entitled to find that the first two design features were substantial fac-

tors contributing to the injury. If there had been a properly set air pressure switch, it would have stopped the supply of electricity to the clutch upon detecting inadequate pressure. The evidence demonstrates that the ram fell because of insufficient pressure in the counterbalance system. If the circuits were interlocked, Fischer would have, in pressing the "stop" button, opened the circuit to the clutch and brake, making it impossible for the clutch to be energized by inadvertently tripping the foot control. A proper label on the control would have alerted all persons that it required turning off two switches to keep the machine from operating.

The jury was entitled to conclude the design defects created a foreseeable risk of injury. This is not a case of " 'unusual and highly coincidental circumstances.' " *Greiten, supra* at 598.

Allen-Bradley maintains that the evidence was insufficient to support the jury's finding that it was causally negligent in the design of the foot switch used to operate the press. The switch consisted of a foot pedal enclosed in an aluminum housing, open at one end to permit the operator to insert his foot and depress the pedal. The thrust of the plaintiff's theory is that Allen-Bradley was negligent because the design of the switch permitted a person to inadvertently trip the switch, causing the ram to come down.

Fischer testified that he did not see, hear, or feel himself step on the foot switch. Milhaupt, Rice, and Richardson agreed that, if the flywheel was stopped and the ram came down, it came down because the clutch must have been energized. The president of Cleveland agreed the most probable way for the clutch to become activated was by Fischer stepping on the foot switch.

Milhaupt stated that the foot switch was inadequately guarded because it was "accessible from the toe of the foot from an angle and from the side" and could be

activated by the side of the foot. It lacked a locking device, or "stop pin," a front guard, and rubber pads to prevent it from sliding around the floor. Milhaupt labeled the switch "inherently dangerous." Richardson stated that the shield should have extended over the pedal further to prevent inadvertent activation. He said that a "mousetrap door" in front of the housing, which would have to be depressed to get to the switch, would provide an additional measure of safety. Richardson stated the design of the pedal was inherently dangerous and defective.

Allen-Bradley offered the testimony of three experts. James Rice testified that the foot control device on the press complied with the 1971 American National Standards Institute (ANSI) provision for foot controls. He said that it was good engineering practice to have the pedal visible to the operator so that he knew when he was about to step on it. He testified nonskid pads were necessary on controls using a mousetrap door because otherwise the control would slide as the door is being pushed down. Given normal use, there would otherwise be no need for nonskid pads on the bottom of the device; in fact, it is easier to move the switch out of the way without the pad. Rice stated that a pedal with a nonskid surface would be less safe than a regular pedal because an operator's foot might catch on the surface, tripping the switch. Rice testified that controls with mousetrap doors were known as early as 1964. Allen-Bradley manufactures such a control, and it was available since 1964, but Rice said that this feature is easily avoided by an operator who finds it inconvenient. Rice testified the use of a safety pin would be impractical. He noted that the control at issue did have a mounting device by which one could mount the pedal far enough from the machine so that he could not step on the pedal and reach into the machine. He testified the more

effective safety devices would be part of the common design of the electrical circuitry of punch presses such as an interlock device, air pressure switch, and long mode selection device. He stated that Allen-Bradley anticipated that any press which the foot control might be attached to would have such features.

John Coldwell, a safety consultant, and Robert Jordan, a member of the committee who drafted the 1971 ANSI standard on foot controls, generally agreed with Rice.

The evidence demonstrates there was credible evidence to support a determination that Allen-Bradley failed to exercise ordinary care in the design of the door. Compliance with industry custom is evidence of due care but is not conclusive of it. *Kalkopf v. Donald Sales & Manufacturing Co.,* 33 Wis.2d 247, 252, 147 N.W.2d 277 (1967) ; *Marsh Wood Products Co. v. Babcock & Wilcox Co.,* 207 Wis. 209, 219, 240 N.W. 392 (1932). A plaintiff is not required to prove that the exact injury is foreseeable; it is enough that some injury could reasonably have been foreseen. *Klassa v. Milwaukee Gas Light Co.,* 273 Wis. 176, 182, 77 N.W.2d 397 (1956). The jury could reasonably have concluded that Allen-Bradley should have foreseen that injury may have resulted from its failure to take further available precautions against accidently tripping the foot switch and that such negligence was a substantial factor in bringing about the injury.

The finding that Allen-Bradley was causally negligent is supported by credible evidence.

The jury's apportionment of 12 percent of the causal negligence to Fischer is supported by his testimony that, though he was unfamiliar with the operation of the presses, he placed his arm directly beneath the ram.

The defendants argue it was error to submit two theories to the jury. In *Howes v. Deere & Company*, 71 Wis.2d 268, 273, 238 N.W.2d 76 (1976), the court considered the question and held that it was error to direct the plaintiff to elect between a negligence and a strict liability theory. The court said:

"The decision as to whether to submit one question or two questions, and the order of submission in the event of two questions is to be made by the trial judge in each case. The reason it might be appropriate to submit both questions on occasion is that the liability imposed in a negligence per se case is not based upon a failure to exercise ordinary care with its necessary element of foreseeability, both common elements of an ordinary negligence case."

There was evidence that the design of the press and the switch was unreasonably dangerous and defective and that these defects manifested a lack of ordinary care in the design of the product. It was not error for the trial court in the exercise of its discretion to submit both questions to the jury.

Allen-Bradley contends that the verdict was inconsistent in finding no design defects rendering the product unreasonably dangerous, yet finding that the defendants were negligent in the design of the product. In *Greiten, supra* at 603–04, the court stated:

"Where a plaintiff proves negligence—in this case, the lack of ordinary care in the design of a product—there is no doubt that there may be recovery in the event the defective design results in an unreasonably dangerous product, but there may be recovery for the negligent design of a product even though it is not unreasonably dangerous in the 402A sense. All that is necessary to prove is that the product is designed with a lack of ordinary care and that lack of care resulted in injury. No test of negligence has been called to the attention of this writer

that requires that the product be unreasonably dangerous in order to predicate liability. The use of that and similar terms was laid to rest in *Smith v. Atco Co.*, when we discarded the term, 'inherently dangerous.' " (Footnote omitted.)

We conclude the record is such that the jury could find that the design created a risk of foreseeable harm not necessarily constituting unreasonable dangerousness in the sense in which that term is sued in Restatement (Second) of *Torts*, sec. 402A (1965).

On the reasoning of the *Howes* and *Greiten Cases*, we cannot find the verdict was inconsistent.

The jury awarded Fischer $120,000 for loss of earnings and earning capacity. Cleveland argues that Fischer was "a management person" who lost no future income as a result of his injury and that the trial court, therefore, should have changed the answer to $23,292, the amount of Fischer's actual lost wages. Fischer maintains the trial court should have changed the answer to $282,004, the amount of Fischer's lost wages, plus an amount he could have earned elsewhere during the period he was unable to work, plus the amount estimated by an economist of Fischer's lost earning capacity. The general rule is that a jury may

"allow as damages for loss of earnings for such period as an injured person is unable to perform his usual work or carry on his usual occupation such sum as they find he was reasonably capable of earning at his trade or occupation during such period."

*Schultz v. Miller*, 259 Wis. 316, 328, 48 N.W.2d 477 (1951). The measure of damages for loss of earning capacity is the difference, attributable to the injury, between earning capacity before the incident and earning capacity after. *Reinke v. Woltjen*, 32 Wis.2d 653, 659, 146 N.W.2d 493 (1966).

In *McCrossen v. Nekoosa Edwards Paper Co.*, 59 Wis. 2d 245, 261–62, 208 N.W.2d 148 (1973), we said:

"This court has recognized this problem inherent in determining the present value of future losses and has weighed the inability of a court or anyone else to predict the future with certainty against the considered policy conclusion that the ends of justice will be furthered by recognizing the probabilities in respect to the computation of future damages. In *Reinke v. Woltjen* (1966), 32 Wis.2d 653, 660, 146 N.W.2d 493, this court stated:

" 'In determining damages to be awarded for impairment of earning capacity or loss of future earnings, in most instances, the finder of the fact must deal in some probabilities. . . . Some (but not all) of the elements which cannot always be shown with certainty are the length of time a disability will exist, the degree of improvement or additional disability that will ensue, the aptitude and ability of a disabled person to engage in other types of work, and the compensation he will be able to obtain. As to these and other uncertain elements the trier of fact must be allowed to consider the reasonably apparent probabilities as they appear from the evidence, together with such facts as his age, his education and training, the type work he was doing before the injury, and the compenasation he was receiving, and then in its judgment determine what amount fairly and reasonably represents his loss of earning capacity, reduced to its present value.'

"This court, therefore, has recognized that income at the time of injury is properly considered in the extrapolation of earnings, even though future wages cannot be ascertained with certainty. Wisconsin cases have recognized that, in order to show the impairment of future earning capacity, a plaintiff must be permitted to introduce evidence that is more speculative and uncertain than would be acceptable for proof of historical facts. *Thoreson v. Milwaukee & Suburban Transport Corp.* (1972), 56 Wis.2d 231, 240, 201 N.W.2d 745; *Krause v. Milwaukee Mut. Ins. Co.* (1969), 44 Wis.2d 590, 172 N.W.2d 181; *see also:* Ghiardi, *Personal Injury Damages in Wisconsin*, pp. 123 ff., ch. 8."

Fischer was twenty-nine years of age at the time of trial. He was trained as a tool and die maker. At the time of the accident, it was uncertain whether he would move into management or sales permanently or return to tool and die making. Fischer's injury effectively precluded a choice between managerial and sales work and tool and die making because his disability ended his future as a tool and die maker.

Richard Perlman, an economics professor, testified that the present value of Fischer's lost income as a tool and die maker was $218,810. He said that this figure represented the difference between what the average tool and die maker earned and what Fischer's "recent experience in earnings has been." There was other evidence to consider, however. Capitol's president testified that he promised Fischer he would make at least as much as a salesman for Capitol as he would as a tool and die maker. Shortly before the time of trial, Fischer, who was performing the same duties he performed before the accident, was given a raise from $4.55 per hour to an annual salary of $15,500. Professor Perlman's estimate did not take into account Fischer's raise; however, Perlman testified that it would not substantially change his figures because the effect of the raise would be offset by the loss of overtime pay and fringe benefits and by recent gains in tool and die makers' wages. Perlman acknowledged that management classifications were uncertain and that some sales engineers earned more than tool and die makers. Thus the jury could reasonably have concluded that Fischer's loss of earning capacity was not as great as Professor Perlman's estimate. By the same token, the testimony of Perlman and others affords a basis on which a jury might reasonably find that Fischer did suffer some loss of earning capacity. A job service supervisor at the Wisconsin State Job Service testified that the likelihood

of a handicapped person finding a supervisory job at a different plant is slim because such positions are generally filled by persons working within the plant. Fischer said he applied for a number of other supervisory jobs without success.

We recognize the jury's award as a reasonable attempt to place a monetary value on the defendant's loss of earnings and earning capacity, a necessarily uncertain endeavor. The court did not err in failing to change the answer.

Cleveland argues that the trial court committed reversible error in (a) allowing Fischer's counsel to examine Allen-Bradley's expert adversely and permitting Allen-Bradley to recall the expert, (b) refusing to grant a mistrial based on the conduct of Fischer's counsel and wife during trial, (c) allowing a dictionary to be sent to the jury room. We have examined the record and have concluded that any error in these respects did not affect Cleveland's substantial rights and cannot afford a basis for reversal. Sec. 817.37, Stats., 1975.

*By the Court.*—Judgment affirmed.