DE BAKER, by Guardian *ad litem,* and others, Appellants, vs. AUSTIN and another, Respondents.

*September 14—December 5, 1939.*

For the appellants there were briefs by *Allan V. Classon,* attorney, and *Richard J. Ballman* of counsel, both of Green Bay, and oral argument by *Mr. Classon.*

For the respondents there were briefs by *Everson, Ryan & Hanaway* of Green Bay, and oral argument by *E. L. Everson*.

The following opinion was filed October 10, 1939:

FOWLER, J. As appears from the foregoing statement of facts the case involves an automobile collision. Austin, the defendant, turned left from a highway into a tavern parking space ahead of Simon, who was approaching from the opposite direction, and Simon ran into him. Simon is not a party to the action. The jury found Austin not negligent as to lookout, and that he did not fail to take ordinary care to select a safe opportunity to cross ahead of Simon.

The appellants claim, (1) that on the defendant Austin's own undisputed testimony he was guilty of causal negligence as matter of law, and (2) that the award of damages to the plaintiff Viola is inadequate. They urge that this court should either order the trial court to grant their motion after verdict for a new trial or their alternative motion to change the verdict to find the defendant guilty of negligence that proximately caused the plaintiff's injuries, raise the amount of damages awarded to the plaintiff Viola from $3,000 to a sum deemed by the court adequate, and enter judgment for the plaintiffs on the amended verdict. It is also urged, (3) that the court misinstructed the jury to the prejudice of the plaintiffs.

(1) As the point raised under the first assignment of error is that the undisputed evidence spells causative negligence of Austin, as matter of law, a statement of that evidence is necessary to an understanding of our ruling on that point.

The general picture involved is that Austin, a nineteen-year-old high-school student, and three other high-school students, one of them the plaintiff Viola, sixteen years old, had together attended their high-school "junior prom" in Green Bay, and after midnight left in an automobile driven by Austin for a joy ride. They drove to De Pere, four miles away, and went into a roadhouse there where they stayed until after

1 o'clock. "There was some sloe gin ordered, and there was a Tom Collins passed around," but no other drinking. They drove back to Green Bay, and when passing a roadhouse referred to as the "Zuider Zee," someone suggested that they go in there. The car was too far past to make the turn into the driveway into the roadhouse so Austin drove on and turned the car around and started back toward the roadhouse to turn in. The road was a three-lane paved road. By Austin's own testimony, which is undisputed, he saw the Simon car when he turned around. He says he thought it was two or three blocks away, but at 1 o'clock in the morning his idea of the distance away of the headlights of an automobile coming toward him was necessarily only a guess. Austin was then ninety feet from the tavern. He turned from the outer traffic lane into the center lane and was traveling ten or eleven miles per hour. After seeing the Simon car he looked through his rear-view mirror to see if a car was coming from his rear. The time to look to his rear was then past. His time to look for cars in the rear was before turning into the middle lane of traffic into which he should not have turned without previously ascertaining that safe opportunity for so turning existed. Sec. 85.16 (2), Stats., provides:

"*Vehicles to keep in traffic lanes.* The operator of a vehicle upon a roadway shall not deviate from the traffic lane in which he is operating without first ascertaining that such movement can be made with safety to other vehicles approaching from the rear."

There was ample room for any car coming from his rear to pass at his right in the outside lane. There was thus no occasion to look to his rear after observing the Simon car. His attention should have been to his front, from which he knew a car was approaching. He was forty feet from the tavern when he started to turn to cross the road into its parking space. He made this turn and started across the road

without again looking toward the Simon car. He did not look toward the Simon car until he heard its brakes screech, and it was then only thirty or forty feet away. He was headed straight across the road with the front wheels of his car on its shoulder when the impact occurred. He had traveled eighty feet or more, the last forty at five miles per hour, before reaching the lane of the Simon car without ever looking to see where it was, although he knew it was coming toward him and did not know how fast it was coming. All this by his own testimony. True, he stated in his adverse examination which was before the jury:

"I knew the Simon car was in city limits [when I saw it] and figured twenty-five miles per hour. He came six hundred feet while I was going ninety feet; I figured that it would take him a longer time to get there, and then I would have gotten into the Zuider Zee. I saw him coming two blocks away. I knew I had plenty of time with him coming at a reasonable speed. I could have gone into the Zuider Zee had he been coming twenty-five miles per hour. I could not say exactly how fast he was coming."

It is claimed that the testimony above quoted was sufficient to take the case to the jury on the two questions of negligence submitted to them. We think not. Austin could not rely on his "figuring" on the probable safety of turning in front of Simon's car when a mere glance to his right before entering Simon's lane of travel would have apprised him of the danger of attempting to cross, and would have enabled him at the speed he was going to stop his car in time to avoid a collision. Only the exercise of reasonable judgment could excuse him for not again looking toward the Simon car, and reliance on mere "figuring" was not the exercise of reasonable judgment. It is quite true that Simon was negligent, as matter of law, for exceeding the statutory speed limit which was twenty-five miles per hour at the place of collision. Even if Simon's speed was seventy miles per hour, as Austin "figured," and

was a proximate cause of the collision, and his negligence was greater than Austin's, this did not excuse Austin from responsibility to the plaintiff Viola, who was sitting in the back seat of the Austin car, and who it is not claimed was negligent. Austin's liability to the plaintiffs is fixed by his own causal negligence, although Simon may also be so liable.

The only case cited by either party as bearing on the negligence of Austin is *Lardeau v. Johnson,* 203 Wis. 509, 513, 234 N. W. 710. Counsel for the plaintiffs claim this case rules the instant case in the plaintiffs' favor. It is true that some facts involved in that case differ from those here. The oncoming automobile in that case was a block away, while here it was two or three; the turning car there was stopped before attempting to cross ahead of the oncoming car, put in low gear and started in motion, while the turning car here was already in motion, traveling five miles per hour, and its gears shifted to second speed. But the driver of the crossing car in each case knew the other car was approaching. Neither looked to see where it was before invading its path. There was ample opportunity in each case to do so, and so looking would have enabled each driver to avoid the collision. That is the crucial point in each case. It is said in the opinion in the *Lardeau Case* that a statute cited afforded "a standard by which to measure his [the turning driver's] conduct in the statutes forbidding him to drive to the 'left side of the center line of a highway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in safety.' Sec. 85.01 (9), Stats." The statute there referred to is the statute of 1927. The present statute on the precise point is somewhat different, sec. 85.15 (2), Stats. 1937, as it exempts roads laned for traffic from the provision. But there are other statutes that afford equally applicable

standards of care applicable.   Sec. 85.18, subs. (8) and (9), provide:

"(8) *Vehicles emerging from alleys or private driveways to stop.*   The operator of a vehicle emerging from an alley, private driveway or garage shall stop such vehicle immediately prior to moving on to the sidewalk or sidewalk area extending across the path of such vehicle, or if there is no sidewalk or sidewalk area then before crossing the near limits of the roadway.

"(9) *Emerging from alley or private driveway.*   The operator of a vehicle entering a public highway from an alley, garage or private driveway shall yield the right of way to all vehicles approaching on such highway."

The purpose of these statutes is to assure a proper lookout by the driver of the emerging car.   The same degree of care as to lookout should be exercised in turning into a driveway as in emerging from it.   We do not mean to imply that these statutes oblige one about to turn left into a driveway to stop before invading his left side of the road, but he is obliged to make as effective a lookout as stopping would have afforded him, and is obliged to make as effective a lookout to avoid interfering with an approaching car as would have been required had he been entering the highway from a driveway. So of sub. (5) of sec. 85.18, Stats.:

"(5) *Vehicles turning left in intersections.*   The operator of a vehicle within an intersection intending to turn to the left across the path of any vehicle approaching from the opposite direction, may make such left turn where it is permitted only after affording a reasonable opportunity to the operator of such vehicle to avoid a collision."

The reason for this statute is to assure a proper lookout by the driver of the turning car.   The same degree of care as to lookout should be exercised in turning left across the path of oncoming cars at points other than intersections as at intersections.   There are numerous decisions on conduct of drivers at intersections constituting causal negligence as matter of

law that are equally applicable to the instant case. *Geyer v. Milwaukee E. R. & L. Co.* 230 Wis. 347, 284 N. W. 1; *Ziemke v. Faber,* 221 Wis. 512, 266 N. W. 217; *Whyte v. Lindblom,* 216 Wis. 21, 255 N. W. 265, 256 N. W. 244; *Mader v. Boehm,* 213 Wis. 55, 250 N. W. 854; *Brown v. Haertel,* 210 Wis. 345, 244 N. W. 630; *Paluczak v. Jones,* 209 Wis. 640, 245 N. W. 655.

(2) From the above it appears that the plaintiffs would have been entitled to have their alternative motion to amend the verdict and enter judgment thereon granted by the court had they not incorporated in it a motion to raise the assessment of Viola's damages. Their claim as to this assessment is that it was so inadequate as to indicate passion and prejudice on the part of the jury. There was nothing in the case to excite passion or prejudice against Viola, a sixteen-year-old girl, who was manifestly guilty of no negligence. While the assessment was not large in view of her injuries we do not consider it, nor did the trial court, below the amount that an unprejudiced jury might properly assess. Dr. Robb, an ear specialist, testified that Viola had a ruptured eardrum. Her hearing is good. She has an annoying ringing in the ears which is continuous. She is more likely to lose her hearing in later life than if her eardrum had not been ruptured. Usually when the ringing is caused by concussion it clears up, but it is hard to say how long it will take. Dr. Troup, another ear specialist, testified that the eardrum was healed, and that there was a "small crust" on the drum. Dr. Quigley, who attended Viola, testified as to her physical injuries sustained in the collision and her condition during her hospitalization. She was delirious or semiunconscious for six days. She had two extensive skull fractures. There were four fractures of her pelvis. On the seventh day she was put in a cast from her chest down, including both legs to the ankles, which was retained for eight weeks. Twelve days after removal of the cast she was able to move around so she was taken home.

The pelvis shows some distortion, but it does not appear how much. This might affect her in childbearing, but how much is not shown. The pelvic distortion disturbs the sacroiliac joint, and to this back pains of which she complains are referable. Pains in the leg are also so referable. One doctor thought she was not fully recovered from the injury to the brain from the concussions, others thought she was. The description of the girl's treatment and condition while in the hospital was such as to excite great sympathy, and its tendency would be to enhance rather than minimize damages. The jury exercised restraint, more likely from conscientious performance of duty than from passion or prejudice. Perhaps in an effort to stand straight the jury leaned backwards, but this does not vitiate their verdict. We consider that the amount of the damages as found by the jury cannot be increased by the court.

Under the situation existing, we consider that the trial court should have granted the plaintiffs' motion for amendment of the verdict, except as to damages assessed to Viola, and entered judgment on the verdict as amended. The causal negligence of Austin as matter of law is so clear that a new trial should not be granted.

(3) The order being for entry of judgment there is no need to consider the assignment of error as to instruction of the jury. The instruction claimed erroneous had no possible bearing on the question of damages. Any other effect it had, even if erroneous, is overcome by amendment of the verdict.

*By the Court.*—The judgment of the circuit court is reversed with instructions to the circuit court to grant the plaintiffs' motion to amend the verdict of the jury in accordance with this opinion and enter judgment for the plaintiffs on the amended verdict.

A motion for a rehearing was denied, with $25 costs, on December 5, 1939.