SCHULTZ and wife, Plaintiffs and Respondents, vs. MILLER and another, Defendants and Appellants: LENON and others, Interpleaded Defendants and Respondents.

*May 8—June 15, 1951.*

For the appellants there were briefs by *Kivett & Kasdorf* of Milwaukee, attorneys, and *J. Arthur Moran* of Delavan of counsel, and oral argument by *Clifford C. Kasdorf*.

*John B. Morrissy* of Lake Geneva, for the respondents.

For the interpleaded respondents Frank S. Lenon, Robert K. Lenon, and Milwaukee Automobile Insurance Company, Limited, Mutual, there were briefs by *McCue, Regan & McCue* of Milwaukee, and *Crosby H. Summers* of Janesville, and oral argument by *Mr. Summers*.

*Emmet Horan* of Milwaukee, for the interpleaded respondent Globe Indemnity Company.

MARTIN, J. This action grows out of an automobile accident that occurred at about 8:30 a. m. on August 11, 1948, in the city of Lake Geneva, Wisconsin.

Plaintiffs had taken their automobile to the Lenon garage in Lake Geneva for repairs to the speedometer. Because the repairs could not be made immediately, Jack Abbott, an employee of the garage, after obtaining permission from his employers or at their suggestion, offered to drive the plaintiffs home and return the automobile for repairs. The plaintiffs accepted, and Abbott drove the automobile out of the garage and north on Broad street which is approximately sixty-six feet wide. He had gone a few blocks when he collided with the automobile of R. W. Miller, who had been driving south and turning left to go east onto Dodge street, which is about thirty feet wide.

The jury verdict, which was approved by the trial court, found defendant R. W. Miller causally negligent with respect to lookout and with respect to turning to the left at the intersection across the pathway of the automobile operated by Jack Abbott without affording a reasonable opportunity to Jack Abbott to avoid a collision; Jack Abbott was exonerated of negligence with respect to lookout; and one hundred per cent negligence was attributed to Miller. In addition to medical expenses and damages to clothing and the automobile, which amounts were answered by the court, damages assessed to the plaintiff S. E. Schultz, were: Loss of his wife's services and assistance, $3,080; loss of his earnings, $490; his personal injuries, $50. Plaintiff Ruth Schultz was awarded $12,000 for personal injuries.

Aside from the issues relating to damages, the single issue before this court is whether Abbott was negligent as to lookout as a matter of law.

R. W. Miller testified that he was traveling between fifteen and twenty miles an hour approximately six feet to his right of the center line on Broad street as he approached the

intersection; that it was raining and before the collision he projected his head out of the window and looked back because he could not see through the rear-view mirror due to the fog; that it was while he was in the act of looking to the rear for traffic approaching from that direction that he started to make the turn to the left; that he had given no signal of any kind with his hand for the purpose of indicating a turn; that he was in the act of turning across the intersection and had already partially completed his turn as he turned around and looked to the front again after he had made his observation to the rear and that was the first time he saw the Schultz automobile which was then fifteen feet in front of him. He testified that he could not remember whether the turn he made was a sharp turn.

The testimony of Jack Abbott established that he saw Miller's car coming down the street before it entered the intersection and saw it turn into his car when it was about eight or ten feet away. He testified that he was familiar with the intersection and was driving approximately fifteen or twenty miles an hour about six feet to the right of the center line of Broad street as he approached the intersection.

"*Q*. And the reason you didn't apply the brakes sooner was the fact you didn't see the other car sooner, is that right? *A*. How do you mean that?

"*Q*. The reason—*A*. (interrupting and continuing previous answer) I saw Mr. Miller coming down the road ahead of me but I didn't expect him to turn in front of me."

Abbott did not testify positively that he did not see Mr. Miller extend his head out of the window. He merely stated that he could not say for sure. He testified that there was other traffic going south prior to the time of the collision.

"*Q*. Where was the Miller car the first time you saw it? *A*. I would say approximately twenty feet north of the intersection—something like that—I wouldn't be sure.

"*Q*. Isn't it a fact you didn't see Mr. Miller's car until it was about eight feet from you? *A*. When he was coming into me, that's right.

"*Q*. The first time you saw him he was about eight feet away from you? *A*. When he was coming into me, yes, but naturally I saw the car down the road ahead of me." •

A witness, Don Focht, who was working on a building on the southeast corner of the intersection, testified that he was standing at a place about fifty feet from the south edge of Dodge street; that he saw the Schultz car going north at the rate of fifteen to twenty miles an hour on the right-hand side of the center line; that he did not see the Miller car until the moment of impact and the collision occurred north of the center line of Dodge street. He insisted upon the truth of the latter statement, testifying that a statement which he had given to the defendant prior to trial was erroneous in this regard.

S. E. Schultz testified that when he first saw Miller's car coming Miller's head was out of the window looking back; that at that time the Schultz car was past or north of the center line of Dodge street and Miller's car was turning sharply into them and was about ten to twelve feet in front of them. He stated that he did not think Abbott had time to apply the brakes before the collision.

The law is well established that the credibility of the witnesses and the weight to be attached to their testimony are for the jury.

Specific requirements with respect to signals of intention to turn were enacted into law by the 1949 legislature but these sections were not in force and effect at the time of this accident. The applicable statutes, which remain the same now as they were at the time of the accident, are secs. 85.17 (2), 85.18 (1), and 85.18 (5), Stats. These read as follows:

"85.17 (2) *Turning left*. The operator of a vehicle intending to turn to the left at an intersection or into a private highway shall make such turn from the traffic lane immediately to the right of and next to the center of the highway and shall pass immediately to the left of the center of the intersection, passing as closely as practicable to the left of the center of the intersection, and shall leave the intersection immediately to the right of the center of the intersecting highway."

"85.18 (1) . . . The driver of a vehicle approaching but not having entered an intersection shall yield the right of way to a vehicle within such intersection and turning therein to the left across the line of travel of such first-mentioned vehicle; provided, the driver of the vehicle turning left has given a plainly visible signal of intention to turn as aforesaid."

"85.18 (5) . . . The operator of a vehicle within an intersection intending to turn to the left across the path of any vehicle approaching from the opposite direction, may make such left turn where it is permitted only after affording a reasonable opportunity to the operator of such vehicle to avoid a collision."

Most of the authorities cited by appellants do not consider the right of the parties under the foregoing statutes, which are applicable in this case. For instance, *De Baker v. Austin* (1939), 233 Wis. 39, 287 N. W. 720, involved an accident where the defendant motorist turned left across a highway in front of an oncoming car in order to enter a private driveway, and is not a case which involved a motorist who turned left as in the instant case, across an intersection in the path of an oncoming vehicle. Other cases cited involve a collision between two automobiles approaching an intersection at right angles and are not analogous to the situation now under consideration.

The evidence herein clearly demonstrates that Abbott made at last two observations before the collision occurred and each time observed the Miller car—the first time that he saw Miller's car was when it was twenty feet north of the intersection, and then when Miller turned toward him and

was "coming into him" when Miller was about eight feet away. It was then too late for Abbott to make any effective effort to avoid the collision. This is not a case where the driver failed to see that which was already in sight, as contended by appellants.

*Hansen v. Storandt* (1939), 231 Wis. 63, 285 N. W. 370, and *Lurie v. Nickel* (1940), 233 Wis. 420, 424, 289 N. W. 686, construe the statutes here involved. Hansen sustained injuries arising out of a collision which occurred when Storandt turned left at an intersection just as he was meeting an automobile driven by one Wittmer, approaching from an opposite direction, and with whom Hansen was riding as a guest. The court held that sec. 85.18 (1), Stats., gives the right of way to the driver who is making a left turn only if the latter gives a plainly visible signal of intention to turn, but that such a right of way does not permit such driver turning left to proceed carelessly or recklessly into the path of another car, under circumstances which give the other car an inadequate opportunity to avoid a collision. (In the instant case it is undisputed that Miller gave no signal with his hand so that Miller did not have the right of way.) The court held, as a matter of law, that Wittmer, who was approaching the intersection and in the same position as Abbott herein, was not liable in damages to the plaintiff. It appeared that there was another car approaching on Wittmer's right, to which he directed some of his attention, and the court stated (p. 69):

"Undoubtedly, Wittmer had to direct some of his attention to this car, but this by no means warrants the inference that he did not see the Storandt car. He claims that he did see it. It is true that the jury might reasonably conclude from Wittmer's denial that a left signal was given that Wittmer was not looking at the Storandt car when Storandt signaled and made the turn. This is not sufficient to sustain a verdict of negligent lookout. Wittmer had a duty to keep both cars in view and obviously could not discharge this duty by keeping each of them in sight all the time. He was

perfectly justified in looking from one car to the other, and if during a moment when his attention was focused on the car to his right he missed a left-turn signal and the beginnings of an abrupt turn by Storandt, it would by no means follow that a jury could infer negligent lookout. *Further than this, we think in view of the jury's finding that an abrupt turn was made immediately following the signal that it could not be said that his failure to keep a lookout contributed to the accident.* By hypothesis, the turn was made under circumstances which give him no reasonable opportunity to avoid the collision. The following comment by the court in *Koperski v. Hoeft,* 179 Wis. 281, 283, 191 N. W. 571, is peculiarly applicable here: [Italics ours.]

" 'The jury found that the defendant did not keep a proper lookout. We find no evidence to sustain such a finding. The only possible support in the evidence for this finding is the fact that the plaintiff was struck. The evidence on the part of the defendant is that he was keeping a careful lookout. . . . If the plaintiff was not seen before he was in front of the automobile, it does not prove that the defendant was not keeping a proper lookout. To so hold is to hold that a driver must look constantly in every direction at one and the same time—a manifest impossibility. Upon any theory of the case the plaintiff had appeared in the zone of danger a mere instant before he was struck. . . . It appears from the testimony of the plaintiff himself that he moved into the zone of danger from a point of safety, and the fact that the defendant, the driver of the automobile, did not see him at that particular instant does not charge the driver with negligence under all the facts and circumstances.'

"We conclude that the judgment must be set aside as to Wittmer, and judgment ordered dismissing plaintiff's complaint as to him and granting him a judgment for undiminished damages on his cross complaint."

It is clear that the turn which Mr. Miller made to the left across the intersection was an abrupt one, inasmuch as it appears that he did not comply with sec. 85.17 (2), Stats., which requires the driver to pass as closely as practicable to the left of the center of the intersection and leave the inter-

section immediately to the right of the center of the intersecting highway.

Appellants' argument with respect to the alleged failure of Abbott to notice that Mr. Miller's head was extended out of the window, indicating that he was not keeping a proper lookout, is not tenable. Assuming Abbott had seen it, he would have been under no duty to assume that it was a signal. But even if he did interpret it as a signal, he had a right to rely upon Miller's observance of the law. See *Grasser v. Anderson* (1937), 224 Wis. 654, 659, 273 N. W. 63, which discusses the "plainly visible signal" as provided for in sec. 85.18 (1), Stats. As stated in the trial court's decision:

"The driver approaching from the opposite direction would have no means of knowing whether Miller was looking at someone on the sidewalk or for what purpose he was looking to the rear and it cannot be said that thrusting his head from the window unequivocally indicated the intention to turn to the left."

The facts in this case do not warrant or permit the court to interfere with the jury's findings or to hold, as a matter of law, that Abbott was negligent with respect to lookout.

Appellants contend that the damages in favor of S. E. Schultz for the loss of services of his wife as a result of her injuries are excessive, and the same contention is made with respect to the damages for personal injuries of Ruth Schultz.

Mrs. Schultz was forty-eight years old at the time of the accident and four of her eight children were minors on that date. She described her injuries: "My right ankle was crushed and the leg broken below the knee and my back seemed to be hurt and I was just bruised all over and scratched up a little bit." She was taken to the Lake Geneva Clinic and the ankle set at which time the doctor recommended she be taken to the hospital, but she refused to go as she thought her children needed her at home. She was in such pain for six weeks that she was in bed flat on her back. On the seventh week she was well enough to sit in a wheel

chair and the cast was removed. The latter part of September, 1948, she went West to live and made the trip on a cot in the back of the station wagon, being carried in and out. She had to remain on crutches until the following spring.

An X ray was taken of both legs of Ruth Schultz at the ankle almost immediately after the accident occurred. It is undisputed that these X rays were negative with respect to the presence of arthritis in either ankle. X rays subsequently taken, some of them shortly before the trial, showed the presence of an arthritic condition in the injured ankle and upon the basis of such proof the physicians called by the plaintiff (one of them being Dr. Nordby, an orthopedic surgeon and staff member of Madison General Hospital) testified that such arthritis was traumatic and the result of the injuries sustained by her in the accident. The medical expert testified:

"*Q*. In your opinion, doctor, is the condition permanent or curable? *A*. I believe her condition is permanent as far as her present condition is concerned.

"*Q*. Explain why. *A*. As mentioned, the cartilage cannot be reformed. It is like scratching off a bearing,—the rougher it gets the rougher it makes the opposing surface. We can't replace a cartilage like we do a bearing and it continues to be an irritation to the joint and to cause more and more stiffening in the joint.

"*Q*. You think it is probable it will cause more and more stiffening? *A*. Yes, it is probable.

"*Q*. So you can't give this woman any hope for a better ankle? And it may get worse? *A*. That is my opinion."

He testified further that in his wide experience of treating injuries of this kind he observed that they were very painful; that the pain which Ruth Schultz suffers may reach the point where she will be unable to endure it in which event it will be necessary for surgery to be performed which will result in fixation of the joint and an entire loss of motion of the leg at said joint.

There was proof that whenever she attempts to use the injured leg for any length of time that the leg swells and becomes discolored and that she is unable to continue to use it until such swelling has been reduced; and that for a considerable length of time after the accident she was unable to perform any of her household duties and that thereafter the amount of household duties which she was able to perform was very limited in extent and always will be limited in extent. There was also testimony that she cannot sleep nights and that her general health has been severely affected.

The award of damages is within the province of the jury and unless the verdict is such as to create the belief that the jury was misled by passion, prejudice, or ignorance, the court will not interfere with the verdict awarded. We cannot say that the award herein is excessive.

The nature and extent of the injuries of Ruth Schultz, the fact that she had to have nursing care and household help (even though it was her daughter-in-law who performed these services) for a period of nine months at $30 per week, that thereafter it was necessary to keep her sixteen-year-old daughter out of high school to do the housework, and the possibility of an operation in the future, do not make the allowance of $3,080 to the husband for past and future expense and loss of society and help of wife excessive.

S. E. Schultz was engaged in the business of slaughtering animals and cutting up the meat and disposing of the same. There was no proof as to whether the operation of this business was profitable, but plaintiff did show that Schultz was an experienced butcher, capable of slaughtering animals and cutting meat and otherwise doing all the things that a butcher is called upon to do. Evidence was introduced to the effect that the wages in the community for butchers so qualified were from $70 to $75 per week at the time in question.

The doctor who treated Mr. Schultz' injury is dead and there was no medical testimony. Schultz testified that he

received eight stitches in his eyelid, had to have four different pairs of glasses between the accident and trial, that he suffered headaches, and that his earning capacity was impaired for a period of seven weeks.

A jury is permitted to allow as damages for loss of earnings for such period as an injured person is unable to perform his usual work or carry on his usual occupation such sum as they find he was reasonably capable of earning at his trade or occupation during such period. The court is not permitted or justified to interfere with the award of $70 a week for a period of seven weeks.

The trial court properly answered the next contention of appellants:

"Counsel for the defendants further contend that on the argument to the jury counsel for the plaintiffs and counsel for the interpleaded defendants Bert Lenon Sales Company and the Milwaukee Automobile Insurance Company, Limited, Mutual, mentioned insurance and that such constituted improper argument and that the defendants were prejudiced thereby. Counsel for said last-named defendants made no objection to such argument when made by either of the aforesaid counsel at any time during the argument or prior to the hearing on the motions after verdict and on such last-mentioned hearing the respective counsel attempted by affidavits to establish what had transpired on the argument. In other words, it is sought to have the court determine as an issue exactly what transpired on the argument of respective counsel to the jury. Any question of that character must be determined by the court upon record made at the time of argument and not upon affidavits upon which a record is attempted to be made long after the trial and upon the hearing on motions after verdict. It may be noted that in this case there were three insurance companies with either the word 'indemnity' or 'insurance' in the name of each and, accordingly, it was impossible to even mention the name of the respective companies without mentioning insurance." *Caryl v. Buchmann* (1922), 177 Wis. 241, 187 N. W. 993, and *Basile v. Fath* (1925), 185 Wis. 646, 201 N. W. 247, 202 N. W. 367, cited.

In view of the 'fact that we have absolved Abbott from negligence, we also hold that the actions against the interpleaded defendants and against each other were properly dismissed by the trial court. No useful purpose would be served by a discussion of the questions raised by the defendants and interpleaded defendants regarding liability.

*By the Court.*—Judgment affirmed.