Kowalke, Respondent, vs. Farmers Mutual Automobile Insurance Company, Appellant.

*February 7—February 28, 1958.*

394

For the appellant there was a brief by *Langer & Cross* of Baraboo, and oral argument by *Clyde C. Cross*.

For the respondent there was a brief and oral argument by *Vaughn S. Conway* and *Kenneth H. Conway,* both of Baraboo.

STEINLE, J. It is the contention of the defendant (1) that since the verdict established that the deflation of the tire was a cause of the accident, and that the host-driver did not and could not in the exercise of ordinary care know of the defect which caused such deflation, a further finding by the jury that the host was causally negligent as to management and control was immaterial, and judgment could not properly be predicated thereon; (2) in the alternative, not-

withstanding that judgment could properly be entered upon a finding of negligence as to management and control in such circumstances, the host was not negligent in such regards with respect to not stopping immediately upon noticing that the front end of the car was pulling to the right, since such pull did not interfere with the host's ability to steer or control the car, and the circumstances being such that the act of stopping would have created new hazards; (3) prejudicial error resulted when (a) the court instructed the jury that it "may return a verdict when 10 or more jurors are in agreement upon the answers made;" (b) by the form of the verdict which provided space for dissent at the foot thereof, but only two ruled lines for names of dissenters and notations of the numbers to which there was dissent; (4) the plaintiff did not establish her loss of wages with sufficient degree of certainty to remove the jury's answer from the realm of speculation and conjecture; (5) the medical evidence was insufficient to properly support the jury's award for future pain, suffering, and disability.

It is the position of the plaintiff (1) that judgment in her favor was warranted by the jury's finding that the host-driver was causally negligent in management and control, notwithstanding that the host did not know, before deflation began, that the tire had a latent defect; (2) the jury's finding of causal negligence with respect to management and control was supported by credible evidence to the effect that for an appreciable interval before the accident the host-driver, while cognizant of the abnormal pull on the wheel, did not slow down or stop for inspection and repair; (3) no prejudicial error resulted (a) from the court's instruction that the jury may return a verdict when 10 or more jurors are in agreement upon the answer made, or (b) from the form of verdict submitted to the jury with reference to the provision made for the placing of names of dissenters, (4) the jury's finding as to wage loss was supported by credible evidence;

(5) the jury's finding relative to future pain, suffering, and disability was supported by competent medical evidence.

With respect to the defendant's first and second contentions it is to be borne in mind that a guest may not recover from a host for injuries received in an automobile accident caused by deflation of a tire unless the plaintiff can establish that the host had prior knowledge of the defect and ought to have realized that the use thereof involved an unreasonable risk of harm to the guest. *Jensen v. Jensen* (1938), 228 Wis. 77, 279 N. W. 628.

The defendant submits that since it appears that there was a causal connection between the tire defect and the accident, there could be no recovery against the host in the absence of evidence establishing the host's knowledge of the defect.

It appears without dispute that the tire was defective and that it became deflated as a result of the defect. From the evidence of record the jury was entitled to infer that deflation began at least at the time when the host-driver first noticed the pull to the right. By virtue of the court's change of answer to question 3 it may not be considered that the host had knowledge of the defect prior to the time that he first noticed the pull, that "he knew something was wrong," and that "the car wasn't acting normally." Had the accident occurred at the time when such observations were first made by the host, the situation would fall within the category of cases relied on by the defendant which deal with sudden blowouts or tires going flat suddenly as in *Jensen v. Jensen, supra, Pawlowski v. Eskofski* (1932), 209 Wis. 189, 244 N. W. 611, and *Byerly v. Thorpe* (1936), 221 Wis. 28, 265 N. W. 76. In each of those cases the evidence did not establish that the host had prior knowledge of the existence of the defects. The situations in those cases involved flatting of tire and the immediate loss of control of the car as a result thereof. In none of those cases was this court called upon to treat with a situation similar to that as here where the host felt the pull

to the right, knew that something was wrong, and that the car was not acting normally, but despite such observations continued on his course for an appreciable time and distance before the accident without reducing the speed of the car or without making an effort to stop, the guest not being aware of the host's knowledge of the abnormal working of the car, and not being personally cognizant that something was wrong,—that the car was pulling to the right. Manifestly the situation in the instant cause is distinguishable from those in the cases relied on by the defendant as above cited. Other cases relied on by the defendant are *Klein v. Beeten* (1919), 169 Wis. 385, 172 N. W. 736, and *Waters v. Markham* (1931), 204 Wis. 332, 235 N. W. 797. In the *Klein Case* it was apparent from the record that the accident might have resulted either because of the defective tire or because of negligent operation of the car. This court affirmed the order directing the verdict on the ground that any verdict based upon such considerations would have been speculative. In the *Waters Case* the principal issues involved situations relating to a tire blowout and the operation of the car by the host-driver at an excessive rate of speed. Determination of such matters was attempted at the trial from a consideration of the evidence relating to physical facts alone. No witness testified at the trial as to what had occurred when the accident took place. There too *inter alia* this court was of a view that any finding with respect to such matters would have been speculative. It was said (p. 341):

"All of the antics of the car may be explained by the blowout occurring while the car was being driven at a reasonable rate of speed as well as while the car was being driven at an excessive rate of speed."

However, to be considered in connection with the matter at bar was the observation in the *Waters Case* that (p. 341):

"The physical facts do not show with any certainty that [the host-driver] did anything which, in the exercise of ordinary care, he should not have done, or failed to do anything which he should have done in controlling or managing his car after the blowout occurred."

In the instant case the evidence indicates that the deflation of the tire was not as sudden and abrupt as a blowout, and further that the improper management and control as claimed occurred after the host-driver had noticed that his car was pulling to the right. The trial court was of the opinion, and we concur in his view, that the principle upon which *Sweet v. Underwriters Casualty Co.* (1932), 206 Wis. 447, 240 N. W. 199, was determined, applies to the situation at bar. There, the host-driver was held liable on a finding of negligent operation and control, when, after the breaking and loss of a spring which caused his inability to steer, he drove the car, without attempting to stop, for a distance of 270 feet, when the car suddenly veered to the left and collided with a culvert. In that case it was said (pp. 450, 451) :

"From the time Dole left the mailbox, proceeding westerly for a distance of about 270 feet, at a slow rate of speed, he experienced difficulty both in steering and in controlling his car. He testified in substance: That as he started away from the mailbox he had difficulty in steering his car; that he traveled quite a distance in the ditch trying to get the car back into the road; that he couldn't get it up into the road; that the difficulty continued right down to the time when he hit the culvert; that his car didn't go up into the road the way it generally did; that he noticed the difficulty began right at the mailbox; that this difficulty continued right up to the culvert; that he didn't succeed in getting his car to the center of the road prior to hitting the culvert although he was trying to do so all the time; that although his brakes were in good condition he didn't try to stop; that after he succeeded in getting his car onto the graveled portion of the road he still couldn't get it to the right of the road although he was

trying to do so; that his speed was such that he could have stopped at any time between the mailbox and the culvert within the length of his car.

"Under the situation described by Dole we conclude that the jury was fully justified in finding that Dole was negligent in proceeding under such circumstances. Admittedly he could have stopped his car within a few feet after discovering that something was wrong with it which materially interfered with its steering and control."

The defendant in the case at bar maintains that the situation here differs from that in the *Sweet Case* in that here there was no interference with the host-driver's steering and control up to the time that the car spun around on the highway and went down the embankment, and further that here the host could not have stopped easily and safely.

From the facts in this case the jury was entitled to infer that in view of the antics of the car as described by the host-driver, the tire was in process of deflating at least from the time when the driver first noticed the pull to the right. The evidence indicates that the host was an experienced driver and actually had been engaged in the business of tire repairing. The jury was also entitled to infer that the host ought to have known of the difficulty encountered, at least when the pulling increased as he proceeded, regardless of the fact that he was still able to steer the car. But whether he was or was not to be charged with actual knowledge of the deflating of the tire after first noticing the pull of the wheel to the right, there is of record his own admission that he knew that something was wrong and that the car was not operating normally. It is apparent that the host had knowledge that something was wrong and that the car was not acting normally throughout the entire distance while he was proceeding from the point where he first made such observation to the place of the accident. The jury was entitled to find from the evidence that the distance so traveled

was a quarter of a mile and that for a considerable part of the way there were shoulders on both sides of the highway. It cannot be held, as argued by the defendant, that there was no interference with the driver's ability to manage and control the car up to the very instant that it spun on the pavement and went over the embankment. Since the driver knew that something was wrong he ought to have realized that a deflating tire or other defective condition was causing the abnormal pull, notwithstanding that he was still able to steer on a straight road against the pull. The presence of the oncoming curve must have been apparent to him. He ought to have recognized that in view of the pulling of the wheel which increased as he proceeded, he probably could not negotiate the curve with reasonable safety. There was no other traffic on the highway at the time.

The failure of a driver to slow down, stop, and investigate after having notice of a defective tire or other defective equipment which was probably causing the abnormal operation of the car, may well under circumstances as here, constitute negligence with respect to management and control. It was for the jury to determine whether the driver was negligent in such regard when under the circumstances he continued in his course without slowing the car or stopping to investigate. There is sufficient evidence of record to sustain the jury's finding in such regard.

Prejudicial error is also assigned by the defendant with respect to the court's instruction relating to the five-sixths-verdict rule. The placement of but two lines at the foot of the verdict for names of dissenting jurors is also challenged as having been prejudicial.

The trial court instructed the jury *inter alia* as follows:

"The court, of course, would like to have you be unanimous in all of your answers if you can be, however, this is a civil case and the jury may return a verdict when 10 or more jurors are in agreement upon the answers made. As to any

jurors who dissent or disagree with the answer made you will sign your name and the number of the question to which you dissent in the spaces provided at the foot of the verdict."

At the foot of the verdict the following appeared:

"Dissenting jurors:
————————— as to question ——————————
————————— as to question ——————————"

There was at least five inches of space below the lines typewritten on the verdict form where additional dissenters, had there been such, could have inserted their names as to answers of questions with which they did not agree.

The instruction as given does not coerce or restrict the right of individual jurors to express disagreement. The very language "As to any jurors who dissent or disagree" manifestly indicated to the jurors their right to disagree. In its contention that the instruction was erroneous, the defendant relies on *Guth v. Fisher* (1933), 213 Wis. 323, 251 N. W. 223; *Kasper v. Kocher* (1942), 240 Wis. 629, 4 N. W. (2d) 158; *Perkie v. Carolina Ins. Co.* (1942), 241 Wis. 378, 6 N. W. (2d) 195; and *Johnston v. Eschrich* (1953), 263 Wis. 254, 57 N. W. (2d) 396. In the *Guth Case* the court said (p. 330): " 'The same 10 [jurors] *must* be in agreement upon all of the answers made.' " In the *Kasper Case* the court said (p. 636): " 'The same 10 jurors *must* agree to answers given to each material essential question before the answer is written in.' " In the *Perkie Case* the court said (p. 383): " 'Incidentally all 10 [jurors] *must* agree on all of the questions in order to render a good verdict.' " In the *Johnston Case* the court said (p. 260): " 'Each answer made by the jury shall be agreed to by the same 10 jurors and you are instructed that the same five sixths of the jurors *must* agree to each answer.' "

Specifically, the instruction in the instant case provided that: "The jury may return a verdict when 10 or more

jurors are in agreement upon the answers made." That language does not indicate that the jurors must agree upon the answers made, nor that they may not disagree. There is no suggestion of obligation on the part of any juror to suppress ultimate disagreement.

The practice of trial courts in this state is not uniform with reference to the matter of the place upon the verdict where dissenting jurors are to write their names in relation to answers of questions to which they disagree. Most special-verdict forms in this state contain place for such purpose immediately after or under the line or space provided for the answer to each respective question. Other special-verdict forms are designed as here with space provided at the foot of the entire verdict for names of dissenters in relation to the answering of questions to which they do not agree. It seems to us that both methods furnish adequate opportunity for expression of dissent, and that they afford clear indication to dissenting jurors as to where they are to place their names. Since there is no statutory authority or rule of this court prohibiting the method as employed in this instance, it cannot be held that it was error to use such method. Nor can we find prejudice with reference to the claimed error respecting the provision of but two lines for names of dissenting jurors. It is recommended, however, that when but two lines and additional space is provided, the court in its instructions advise the jurors that dissenters may place their names on the lines or in the additional space. The instructions in the instant matter in nowise limited the number of jurors who were privileged to dissent, and it is assumed, that had there been more than two jurors who wished to do so, they would have utilized the space below the lines provided, in the event that the lines had already been filled. We find no error in these regards.

Next we consider the defendant's contention that the amount of damages pertaining to plaintiff's wage loss as

determined by the jury is not supported by the evidence. The defendant submits that the only wage loss established was for one and one-half weeks at $34 per week for the period immediately following the accident. The amount for wage loss as found by the jury and confirmed by the court was $816.34.

"A jury is permitted to allow as damages for loss of earnings for such period as an injured person is unable to perform his usual work or carry on his usual occupation such sum as they find he was reasonably capable of earning at his trade or occupation during such period." *Schultz v. Miller* (1951), 259 Wis. 316, 328, 48 N. W. (2d) 477.

There is credible evidence of record that at the time of the accident the plaintiff was forty years of age. She had been married. Prior to 1951 she had lived on a farm doing manual work, including such as unloading hay, and carrying heavy items with her arms. She moved to Baraboo, did her own housework, and for a year worked in a factory rolling and soldering wire in the finishing of industrial coils. In June, 1955, she started to work at the Baraboo Laundry and continued in that employment until the accident. Her work there consisted of preparing shirts for ironing, and also of hanging and folding shirts. This work required her to stand much of the time and to use both arms while they were extended from her body. She experienced no difficulty in doing her work. For recreation she enjoyed dancing.

The plaintiff was hospitalized for four days immediately following the accident. The hospital record indicates that she had sustained injuries evinced by multiple bruises to her back, chest, shoulders, and left knee. X-ray films taken on the day following her admission to the hospital showed no fracture or dislocation in the back, chest, shoulders, or left knee, but did indicate the presence of hyperthropic osteoarthritic change in the dorsal spine area which had commenced before the accident. Shortly after her discharge from

the hospital she was advised by her physician not to return to work until the end of the following week. It appears that the laundry's busy season is in the summertime and continues through the middle of October. The plaintiff returned to work on July 2d. She experienced pain in her back and right shoulder while at work and consulted her physician about it. She remained at this work until October 26th when she left the employ of the laundry, and was obliged frequently to take days off because of pain in her shoulder. Her employment record indicates that between July 2d and October 26th she missed one hundred eighty-three and one-half hours on working days, which time in the aggregate totaled about five weeks. There is testimony to the effect that such absences were due to inability to work because of pain. In some of the weeks following the accident she was able to earn $40. Her employer testified that before the accident she had been a rapid worker but that thereafter she was unable to keep up her end of the work, and that he had complaints from others about her failure in such respect. She remained in Baraboo for several weeks after leaving her employment in the laundry. She did her own housework, but experienced difficulty in her hip and shoulder. She went to Fort Pierce, Florida, to spend the winter with her daughter. While there she attempted to do remunerative work—packing tomatoes and grading fruit—but found that she was not able to move her arms and twist her body in the necessary performance of such work without experiencing pain in her hip and shoulder. Later she went with her daughter to Vero Beach, Florida, where she worked full time for three weeks at a packing plant. In May, 1957, she returned to Baraboo and resumed her employment at the laundry, but has experienced pain in her hip while being engaged in her work. On the basis of the evidence adduced at the trial, the jury was entitled to determine that previous to the accident the plaintiff was able to work easily and competently, but that as a

result of the injury sustained in the accident she was not able to do so thereafter up to the time of the trial—her use of shoulder, arm, and hip muscles in her work being followed with painful effects which required considerable rest, and caused consequent inability to work and necessary absence from work.

The measure of damages for loss of time is the value of the plaintiff's time while prevented from working by reason of the negligence of the defendant,—the true test being what the plaintiff's services might be worth to him in his ordinary employment. See 15 Am. Jur., Damages, p. 500, sec. 90; 25 C. J. S., Damages, p. 617, sec. 86. In the light of the evidence with respect to the loss of time and earnings of the plaintiff in the instant matter, we cannot find that the amount assessed by the jury with reference thereto was unreasonable.

The defendant also challenges the jury's award for future pain, suffering, and disability. It contends particularly that the award is not sustained by the degree of medical proof required to establish permanent disability, and that hence the jury's finding in this regard is speculative.

To justify the assessment of damages for future or permanent disability, it must appear that such continued disability is reasonably certain to result from the injury complained of. *Boelter v. Ross Lumber Co.* (1899), 103 Wis. 324, 79 N. W. 243.

In the instant case Dr. Huth, who attended the plaintiff while she was hospitalized, and who also saw her and prescribed for her on several occasions thereafter, testified to a finding of arthritis which he believed existed before the accident. He stated that while the plaintiff was in the hospital, there were areas of tenderness on the right shoulder, right posterior chest, lower dorsal area, lumbar area, and sacrococcyx area, and the left knee. When asked as to his opinion to a reasonable medical certainty whether the plaintiff's arthritic condition had been aggravated by the automo-

bile accident he replied; "All I can say is there is a possibility." Clearly such testimony was not sufficient to sustain the jury's award. A mere possible continuance of disability by reason of an injury is not a proper element of damages. To justify assessment for future or permanent disability, it must appear by the proofs that continued or permanent disability is reasonably certain to result from the injuries. *White v. Milwaukee City R. Co.* (1884), 61 Wis. 536, 541, 21 N. W. 524.

Counsel for the plaintiff maintain, however, that the testimony of Dr. Stadel who examined the plaintiff about a week before the trial was sufficient to sustain the award. Dr. Stadel testified that he had found spasm in the plaintiff's lumbar region and also on the right side of her neck, and that from a study of X-ray pictures, he observed the presence of osteoarthritis to a moderate degree. He said that he was of the opinion that the arthritic condition had preceded the accident, and that had it not been aggravated, it would not have been disabling. He said that a blow to the area shown in the X-ray picture would be disabling. He said that in his opinion to a reasonable medical certainty, the accident (material detail of which was set forth in the hypothetical question) aggravated the pre-existing condition,—that the symptoms resulting from the aggravation of the osteoarthritis is more or less permanent. He further testified that it was his opinion that "this type of accident which was described could certainly cause malfunction of the tissues, ligaments, and nerves of the shoulder. Such malfunctioning would be evidenced by pain or relaxation of the muscles involved at the joints and of the ligaments involved. It is my opinion to a reasonable medical certainty that the injury to Mrs. Kowalke's shoulder is of a type which usually lasts for a long time, and may even be permanent."

Although in the complaint damages for permanent injury had been demanded, the trial court did not submit for the

jury's consideration the express item of damages for permanent injury. In its instruction on this subject, the trial court stated:

"Subdivision (c) inquires as to future pain, suffering, and disability. If it appears from the evidence to a reasonable medical certainty that Rose Kowalke will continue to suffer pain, suffering, and disability, including loss of future earnings, you will determine the extent and duration of such future pain, suffering, and disability and award such sum as will fairly and reasonably compensate her under the instructions as given above."

We are of the opinion that the instant situation is comparable to that in *Graff v. Hartford Accident & Indemnity Co.* (1950), 258 Wis. 22, 44 N. W. (2d) 565, and is to be controlled by the determination in that case. There the plaintiff had been afflicted with arthritis previous to the accident. The medical testimony indicated that the accident had aggravated the condition and had brought on the pain which followed the accident. No objective symptoms had been found except a few bruises, affected muscles, and restricted motion of the back. At the trial a physician when asked as to whether he had an opinion to a reasonable certainty whether the plaintiff will recover from her present condition so as to be comparable to what she had been before the accident, said that he did not believe she will recover entirely from it, and that she might get worse. He further testified that he could not say definitely that the plaintiff's condition would be relieved at any definite time in the future, but that he would look for some permanent disability.

In the *Graff Case* the jury assessed damages as follows: $500 for future care and treatment, $500 for pain and suffering, and $5,000 for disability. The trial court set aside the verdict of the jury and granted a new trial in the interest of justice on the ground *inter alia* that the medical proof was

so indefinite and uncertain with respect to the plaintiff's disability, that any allowance required resort to speculation and conjecture on the part of the jury. This court reversed the lower court's order for a new trial and directed reinstatement of the damages as found by the jury, and the entry of judgment upon the verdict as so restored. In the case at bar it cannot be held that the evidence presented by Dr. Stadel relative to future pain, suffering, and disability was speculative or conjectural. It was sufficient to sustain the award.

During the course of cross-examination of Dr. Stadel, a misunderstanding arose between the witness and the examiner relative to matters upon which the witness' opinions were based. The witness testified that his answers were based in part on history given to him by the plaintiff. Upon motion of the defendant, the court ordered the witness' testimony to be stricken on the ground that part thereof was based on history given in the doctor's office. However, the testimony was reinstated when the following answers were given by the witness in redirect and recross-examination:

(Redirect-examination) : "My opinions were based almost entirely on my examination and the X rays. I do not believe I understood Mr. Cross' question with reference to this history as it has come up since. On any examination I do on any patient, I always take a history, that is part of your examination. My testimony here this afternoon to the jury is based upon my examination and X rays."

(Recross-examination) : "I didn't understand when you asked if my opinions were based on this history. My opinion, as I have testified, is based upon my findings. My opinion of what I found on examination had nothing to do with the history. I did not hear any complete history of this case until this afternoon."

We perceive of no error on the part of the court in having permitted the reinstatement of Dr. Stadel's testimony which

had been ordered stricken. Error would have resulted had the court not reinstated the testimony in question.

We are constrained to determine that the judgment must be affirmed.

*By the Court.*—Judgment affirmed.