Ronald PAULSON and Kenneth Wachholz, d/b/a Breezy Prairie Farms, Inc., Plaintiffs-Appellants,†

v.

OLSON IMPLEMENT COMPANY, INC., Super Steel Products Corporation, Defendants-Respondents.††

Supreme Court

*No. 81–545. Argued April 28, 1982.—Decided June 2, 1982.*

(Also reported in 319 N.W.2d 855.)

---

† The parties filed this action in the name of Ronald Paulson and Kenneth Wachholz d/b/a Breezy Prairie Farms. Throughout the pleadings we find the identity of the plaintiff corporation repeatedly changed. We take judicial notice of the records of the Secretary of State for Wisconsin which show Breezy Prairie Farms, Inc., was incorporated by Paulson and Wachholz prior to the commencement of this action.

†† Motion for reconsideration denied, without costs, on July 13, 1982. ABRAHAMSON, J., took no part.

For the appellants there were briefs by *Jack Aulik* and *Aulik & Brill, S.C.*, attorneys, of Sun Prairie, and *Roger Merry*, of Belleville, of counsel, and oral argument by *Jack Aulik*.

For Olson Implement Company, Inc., there was a brief by *E. Clarke Arnold* and *Callahan & Arnold* of Columbus.

For Super Steel Products Corporation there was a brief by *Robert E. Cook* and *Cook & Franke, S.C.*, of Milwaukee and oral argument by *Robert E. Cook*.

WILLIAM G. CALLOW, J. This is an appeal from judgments of the circuit court for Columbia county entered by Judge Howard Latton dismissing this breach of warranty action against defendants Olson Implement Company, Inc., and Super Steel Products Corporation.[1] On December 7, 1981, the court of appeals certified this case to us pursuant to sec. (Rule) 809.61, Stats., for resolution of the following issue: "Is privity of contract necessary to enable a purchaser to maintain an action for economic loss resulting from breach of an express warranty by the defendant to the purchaser?" Because we have reached the conclusion that privity existed between the plaintiffs and defendants, we are not presented with the issue posited by the court of appeals. Our finding of privity necessitates that we reach the additional issue of what constitutes reasonable and timely notice in order to finally terminate the time-consuming and costly litigation the parties have endured in this case.

The facts generating this litigation may be summarized as follows: The plaintiff corporation, Breezy Prairie Farms, Inc., had two stockholders, Ronald Paulson and Kenneth Wachholz, who are neighboring dairy and grain

---

[1] A prior defendant to this action, Specialized Products, Inc., was dismissed from the action on August 25, 1980, for plaintiffs' failure to support a claim against it. This dismissal is not a part of the appeal before us.

farmers (hereinafter plaintiff corporation referred to as Paulson and Wachholz). In the fall of 1975 the plaintiffs contacted Lawrence Olson, of Olson Implement Company, Inc., to inquire about a grain drying and handling facility for their corn harvest. In January of 1976 Olson, accompanied by David Miller of Super Steel Products Corporation, went to the Paulson home to discuss such a facility with both Paulson and Wachholz. Paulson testified they informed Olson and Miller that they "definitely wanted something to keep up with [their] daily harvesting schedule, and that [they] were harvesting approximately 5000 bushels a day and [they] wanted a dryer that would dry what [they] harvested in one day, or 5000 bushels." After they had looked over Super Steel's literature on drying bins, they testified Miller informed them that Super Steel was experimenting with a new stirating device, a "seven screw, seven auger stirator," and that it would more than double the capacity of the 30-foot drying bin advertised in the brochure (which had three auger stirators and dried 2,400 bushels of corn in twenty-four hours). Paulson testified that Olson and Miller then left the farm to "figure out a facility and come back and give us a price on it."

On March 11, 1976, Olson and Miller returned to the Paulson farm with a written proposal, on a Super Steel form, setting forth the specifications and cost of a seven auger stirator drying bin and a storage bin. No contract was signed or agreement reached on the purchase of the facility, and Olson and Miller left the farm to enable the plaintiffs to discuss the proposal and the financing arrangements. On March 17, 1976, the plaintiffs gave Olson a check for $2,000 as a down payment to hold the price on the bin. Plaintiffs were given a receipt which Paulson described at trial: "It's got our name across the heading, 'Breezy Prairie Farm, Columbus, Wisconsin.

Merchandize [sic] Sold.' It's got 'Cash, $2,000.00. Sold by L. Olson. Down Payment on Bin Job. See Order Super Steel. Paid Check 340, $2,000.00.' And my signature is on the bottom."

Throughout the summer of 1976 Paulson and Wachholz had contact with Olson regarding whether they would purchase the bin if they obtained additional acreage and whether their crop was coming along well enough to warrant purchasing the bin. On or about September 20, 1976, Paulson and Wachholz went to Olson's office and signed an agreement to purchase the drying facility. According to the plaintiffs' testimony, at the time of the signing of the purchase agreement, Olson affirmed Miller's earlier representations that the drying equipment would dry 5,000 bushels of corn in a twenty-four-hour period.

After receiving their drying bin, Paulson and Wachholz dried three or four bins containing 5,000 bushels of corn and discovered that instead of twenty-four hours it took approximately forty to fifty hours to dry. Paulson phoned Olson to complain about this, and both Miller and Olson stopped by the farm on several occasions in 1976 to discuss any problems with the facility. On one of these occasions, the defendants recommended increasing the drying temperature to alleviate the problem. This was done, but it provide no improvement in the drying time. Olson then replaced a drying fan with a new one from his shop. Paulson testified this "made no difference."

Paulson testified at trial that in 1977 Miller put a new drying floor in the facility because "[h]e felt the floor was restricting the air flow." Plaintiffs continued to have problems drying corn in 1977 and continued to complain to Olson. Wachholz and Paulson stated nothing was done about their complaints and that it took them forty to fifty hours to dry 5,000 bushels of corn. Plain-

tiffs' harvest time was delayed, and they were forced to leave 325 acres of corn standing in the field until the spring of 1978.

The failure of the facility to dry 5,000 bushels in twenty-four hours continued into 1978, requiring Paulson and Wachholz to secure storage space for the corn they could not put in the dryer. This involved considerable expense in hauling and securing off-farm storage. On October 5, 1978, Paulson and Wachholz commenced suit against Olson Implement Company, Inc., Super Steel Products Corporation, and Specialized Products, Inc.,[2] alleging breach of warranty as the grain drying unit never dried 5,000 bushels of corn in twenty-four hours.[3]

The jury returned a special verdict on August 1, 1980, finding that both Olson Implement Company, Inc., and Super Steel Products Corporation warranted that the drying equipment sold to the plaintiffs had a drying capacity of 4,800 to 5,000 bushels of corn in a twenty-four hour period; that the plaintiffs relied upon this warranty in purchasing the equipment; and that they were damaged as a result of their reliance on the warranty. The trial court, in a decision and order following the verdict, responding to motions by the defendants, dismissed the action against both defendants for the following reasons.

[2] The relationship between the defendants is characterized as follows: Specialized Products manufactures grain stirring devices which Super Steel Products incorporates into grain drying bins. Olson is a dealer distributor who sells Super Steel products, notably grain drying bins.

[3] Both defendants denied ever warranting that the grain drying bin would dry 5,000 bushels of corn in a twenty-four hour period. Olson testified at trial that, when he inspected the grain drying equipment following plaintiffs' complaints, he discovered plaintiffs were drying 9,000 to 10,000 bushels of corn in each drying lot. Additionally, he testified that he believed plaintiffs' problems with the drying bin were the result of poor air flow attributable to fines, or foreign matter, in the corn.

The action was dismissed against Super Steel because "there [was] no privity of contract between the plaintiff and Supersteel [sic]," and the trial court determined that "privity is a requirement for an action on warranty, whether express or implied." The action was dismissed against Olson Implement because the plaintiffs' pleading did not allege having given notice within sec. 402.607, Stats., and because the trial court determined "as a matter of law a two year delay in giving notice would be unreasonable."

We begin our review of this case with an examination of whether privity existed between Paulson and Wachholz and defendant Super Steel. Defendant Super Steel bases its defense on lack of privity on the assertion that it was not a party to the September 20, 1976, sales contract between plaintiffs and Olson Implement.[4] Paulson and Wachholz argue that Super Steel was a party to the contract by virtue of Miller's oral declarations concerning drying capacity, as well as the series of documents which passed between the parties.[5]

Regarding the issue of privity, we believe that both parties to this action incorrectly focused upon whether

---

[4] Defense counsel argues that: Miller was not an agent of Olson Implement; Olson was not an agent of Super Steel; no representatives of Super Steel ever signed any document; plaintiffs entered into a written agreement with Olson Implement on Olson's forms; Olson Implement delivered the equipment and passed title to it to the plaintiffs; plaintiffs paid Olson for the equipment.

[5] Plaintiffs assert in their brief: "Supersteel [sic] made the representations which were the basis of the bargain, representations which Olson could not make because it was unfamiliar with Supersteel's product. Supersteel acquired numerous rights and obligations with relation to the Plaintiffs-Appellants as a result of the contract. Supersteel received payment for the equipment indirectly through Olson; Supersteel was obligated to make, and did in fact make, subsequent repairs to the equipment under the contract; Supersteel was obligated to furnish the equipment which it promised during the negotations [sic] surrounding the planning of the unit." (Citations to record omitted.)

Super Steel was a party to the sales contract for the purchase of the grain drying bin. As we view the case, two contracts were involved: a sales contract between the plaintiffs Paulson and Wachholz and defendant Olson Implement which furnished the underlying consideration for a unilateral contract[6] between Super Steel and the plaintiffs.

We find the instant case analogous to the pre-Uniform Commercial Code decision in *Timberland Lumber Co. v. Climax Manufacturing Co.*, 61 F.2d 391 (3d Cir. 1932). Timberland Lumber contracted with the Vancouver Company, an independent machine dealer, whereby Vancouver agreed to sell a locomotive designed and constructed by the Climax Company according to the specifications and purposes of Timberland. Timberland asserted that warranties and promises made by Climax through its agent, Vancouver, induced it to contract for the locomotive through Vancouver. The third circuit determined that, although it is unusual, it is not impossible for a manufacturer to contract independently with a dealer/distributor and a purchaser. *Id.* at 392. *See United States Pipe & Foundry Co. et al. v. City of Waco et al.*, 130 Tex. 126, 129–30, 108 S.W.2d 432, 433–35 (1937), *cert. denied*, 302 U.S. 749. In *Timberland* the court noted that Climax's desire for the sale of the locomotive elevated its course of dealings beyond the scope

---

[6] *See:* J. Calamari and J. Perillo, *The Law of Contracts*, 17–18 (2d ed. Hornbook Series 1977). A contract is considered unilateral where only one party has made a promise and only that party is subject to a legal obligation. This is typified by the law school hypothetical situation where A says to B, " 'If you walk across Brooklyn Bridge, I promise to pay you ten dollars.' " A has made a unilateral contract which arises when—and if—B performs the act.

While we are cognizant that any distinction between unilateral and bilateral ("promise for a promise") contracts has been largely ignored or abrogated by recent commentators, the instant case is unusual, and we determine the distinction is fitting and applicable.

of the usual manufacturer-consumer transaction. In the words of the court:

"When this fact [that Timberland would not agree to the contract until Climax agreed to guarantee the locomotive] was conveyed to the Climax Company, it replied that it would guarantee the tonnage that the locomotive required would haul. This guarantee the Climax Company intended to be conveyed to the purchaser and it was conveyed to it." 61 F.2d at 393.

The consideration for Climax's promises was the contract between Timberland and Vancouver for the purchase of the locomotive. *See* Ruud, *Manufacturers' Liability for Representations Made By Their Sales Engineers to Subpurchasers*, 8 U.C.L.A. L. Rev. 251, 267–70 (1961). *See also Ruberoid Company, Inc. v. Briscoe*, 293 F.2d 712, 716 (5th Cir. 1961); *Industrias Velasco, S.A. v. Applied Power Equipment & Manufacturing Co.*, 227 F. Supp. 937, 939 (S.D. Tex. 1964) (court held retailer liable because it had made representations of fitness *directly* to purchaser even though actual sale was handled by an export company).

In the case at bar, the jury determined that Super Steel's agent, Miller, *directly* promised plaintiffs on two occasions that a specially tailored Super Steel grain drying bin would dry their harvest of 5,000 bushels of corn within twenty-four hours. Miller's statements were obviously made for the purpose of inducing a sale. From the consumers' perspective in this case, they believed they had a deal with Super Steel to provide them with a drying machine capable of drying 5,000 bushels in twenty-four hours; they believed they were dealing with both defendants. We conclude that through its actions and express representations Super Steel formed a unilateral contract with the plaintiffs which was accepted and became binding when the plaintiffs signed the sales contract with Olson. That sales contract furnished the un-

derlying consideration for the warranty contract between Super Steel and the plaintiffs. We have no difficulty, in law or equity, in finding privity between these parties.

Super Steel argues before us that, if we should determine a warranty was given, then it effectively disclaimed the warranty by the writing on the reverse side of the unsigned form Miller submitted to the plaintiffs detailing the cost of the grain drying bin. Under "Conditions of Sale," the following language on which Super Steel rests its argument appears in part:

"SUPER STEEL PRODUCTS CORP. SELLS EQUIPMENT 'AS IS' AND MAKES NO WARRANTY OF MERCHANTABILITY OF THE EQUIPMENT OR ITS FITNESS FOR ANY PURPOSE OR USE IN APPLICATION, AND THERE ARE NO WARRANTIES OTHER THAN THOSE SET FORTH BY THE MANUFACTURER OF THE ITEM. NO ONE IS AUTHORIZED TO MAKE ANY WARRANTY, EITHER IMPLIED OR EXPRESS, AS TO THE PERFORMANCE, EFFICIENCY OR OTHER CAPABILITY OF ANY EQUIPMENT THAT HAS NOT BEEN STATED IN THE MANUFACTURER'S WARRANTY."

Sec. 402.316, Stats., provides for disclaimers of warranties. Sec. 402.316(1), Stats., states: "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; . . . negation or limitation is inoperative to the extent that such construction is unreasonable." Comment 1 to Uniform Commercial Code, sec. 2–316, reveals the following regarding the drafter's intention with respect to this provision: "[This section] seeks to protect a buyer from unexpected and unbargained language of disclaimer *by denying effect to such language when inconsistent with language of express warranty*

and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise." *Id.* (Emphasis added.)

The language on the Super Steel form appears to encompass the implied warranty situation (i.e., "THERE ARE NO WARRANTIES OTHER THAN THOSE SET FORTH BY THE MANUFACTURER") and further appears to disclaim any warranty, express or implied, made by an agent which is not stated in the manufacturer's warranty.

We conclude that the disclaimer on the back of the Super Steel form related to its advertised, standard manufactured bins and not to any specially manufactured equipment. In other words, the disclaimer pertained to representations of capacity of the standard three auger stirator model which were inconsistent with those detailed in Super Steel's literature (to dry 2,400 bushels of grain in twenty-four hours). The disclaimer did not apply to the situation where a specially manufactured seven auger stirator facility was warranted by a manufacturer representative to dry 5,000 bushels of grain in twenty-four hours and where the literature was silent on this specially designed equipment.

In the instant case, a jury found that the defendants warranted the grain drying equipment to perform to the plaintiffs' requirements. Even if we determine that the words on the back of the Super Steel form relate to and disclaim Miller's express warranty regarding the capabilities of the specially manufactured equipment, they could not be construed as an effective disclaimer because they would be inconsistent with the express warranty, and they result in unbargained for language and the buyer's surprise. J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, 431–33

(2d ed. Hornbook Series 1980) (hereinafter White and Summers).

Because we have found privity between the parties, we are obliged to address the issue of what constitutes sufficient notice of breach of warranty. The trial court dismissed the action against Olson Implement on the ground of lack of notice.[7] Judge Latton concluded: (1) the plaintiffs' pleading contained no allegation of giving notice, and (2) the delay in giving notice was unreasonable.

Sec. 402.607(3)(a), Stats., requires that a buyer notify a seller of a breach of contract within a reasonable time or be barred from any remedy. In the instant case, the issue of notice was not presented to the jury. The trial court concluded as a matter of law that the requisite notice had not been provided, and this conclusion we may independently review. The trial court noted that, although the grain drying equipment was installed and used in 1976, the lawsuit was not commenced until October 5, 1978.

Examining the trial court's first proposition that plaintiffs' complaint was defective as it failed to assert notice, we note that, while the plaintiffs' complaint and amended complaint may not have been artfully drafted, under our liberal pleading rules we believe the issue of notice was apparent. At paragraph 11 of plaintiffs' amended complaint the following appears, in part: "That defendants told plaintiff's [sic] agents [Paulson and Wachholz] the reason the bin was not performing prop-

---

[7] Defendant Olson Implement also grounded its motion to dismiss on the contention that there was no evidence of a warranty or representation on its part. Because the trial court found insufficient notice, it did not reach this issue. The jury returned a special verdict, holding that Olson had warranted the equipment, and we find credible evidence in the record to support it.

erly was caused by poor floor construction and a new floor was constructed by defendants in the summer of 1977." Both Olson Implement and Super Steel's answers to the complaint contain language denying that any drying problems were caused by poor floor construction. Although defendant Super Steel denied in full paragraph 11 of plaintiffs' amended complaint in its answer, it admitted in its answer to plaintiffs' original complaint that a new floor had been installed. Obviously, a new floor would not have been installed without the plaintiffs having informed the defendants of dissatisfaction with the drying equipment. Super Steel alleged as an affirmative defense that plaintiffs had failed to provide notice within a reasonable time of the alleged defect in the grain drying bin.

Furthermore, as we concluded in *Hellenbrand v. Bowar,* 16 Wis. 2d 264, 268–69, 114 N.W.2d 418, 115 N.W.2d 533 (1962) :

"Although the notice requirement is a condition precedent to liability and part of the cause of action, it is too late for the defendants now to raise the question as a matter of pleading. Failure to plead notice would be fatal upon demurrer but the parties have gone to trial and to verdict. . . .

"However, the waiver of the pleading does not preclude a challenge to the sufficiency of the evidence to establish a cause of action."

While defendants failed to challenge the sufficiency of the complaint regarding the issue of notice until after the jury verdict, they may challenge the sufficiency of the evidence of notice on this appeal.

The defendants and the trial court cite several pre-Code cases for the proposition that notice must apprise the seller that the buyer looks to seller for damages for such breach. *Hellenbrand v. Bowar,* supra at 268; *Erickson v. Westfield Milling & Electric Light Co.,* 263 Wis.

580, 587, 58 N.W.2d 437 (1953) ; *Ace Engineering Co. v. West Bend Malting Co.*, 244 Wis. 91, 93, 11 N.W.2d 627 (1943).

We note that with the adoption of the Uniform Commercial Code, Chapter 401, Stats., this is no longer intended to be a requirement of notice. *See* Annot., 93 A.L.R.3d 363, 367 n. 6 (1979) (The Uniform Sales Act predecessor to the U.C.C. sec. 2–607(3)(a) required a "claim of damages" which explains why pre-Code cases use this language) ; Note, *Notice of Breach and The Uniform Commercial Code,* 25 U. Fla. L. Rev. 520, 536 (1973). The official comments to U.C.C. sec. 2–607 reveal the following:

"The content of the notification need merely be sufficient to let the seller know that the transaction *is still troublesome and must be watched.* There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer. . . . *Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy.*"

Comment 4, U.C.C. sec. 2–607 (emphasis added).[8] While this comment is not law, we find it persuasive authority

[8] The argument is advanced that Wisconsin law has retained the distinction between the Uniform Sales Act which required a buyer to notify a seller of *a claim for damages* and the Uniform Commercial Code which abrogates the need for this. *See* Note, *Notice of Breach and The Uniform Commercial Code,* 25 U. Fla. L. Rev. 520, 538 (1973). Wis. Stats. Ann. sec. 402.607(3)(a), 353–54 (2d Reprint 1977), states: "It has been held under present law that notification of the breach is a condition to recovery, and *it is immaterial that seller through other means knew of the defect* in the goods, because he is entitled to notice that buyer looks to him for damages. *Despite this 'looks to him for damages' requirement which appears in the cases, it is not likely that the present law*

which we adopt in order to protect purchasers. *See Boeing Airplane Co. v. O'Malley,* 329 F.2d 585 (8th Cir.

*imposes any appreciably stricter requirement as to the form of the notice than does the Code."* (Emphasis added.) (Citations omitted.)

Examination of several cases reveals that Wisconsin does not intend a stricter standard. *See Wojciuk v. United States Rubber Co.,* 19 Wis. 2d 224, 235a, 235g, 120 N.W.2d 47, 122 N.W.2d 737 (1963). On rehearing this court concluded that plaintiff's statement to defendant, " 'Herb, what kind of tires did you sell me? . . . We had a blowout and a terrible accident resulted from it,' " was sufficient notice. *Id.* at 235. "It is true that Wojciuk made no demand for damages nor statement that he would hold Stuewer [the defendant] accountable. Had the same words been said in a casual conversation, the case might be different, but here the circumstances are of substantial importance. The call was made the same day as the accident, while the Wojciuks were several hundred miles from Milwaukee. The record suggests no reason for Wojciuk to call Stuewer unless he felt that Stuewer *had some obligation because of the tire failure." Id.* at 235g (emphasis added).

Similarly, in *Kennedy-Ingalls Corp. v. Meissner,* 11 Wis. 2d 371, 384, 105 N.W.2d 748 (1960), we held oral notice under the statute must meet the following test: " 'The statute does not require that the notice shall be in any particular form. It should fairly advise the seller of the defect asserted in the performance of a particular promise or sale; it should repel any inference of waiver, and at least by implication should assert that there has been a violation of the buyer's legal rights.' 3 Williston, Sales (rev. ed.), pp. 41, 42, sec. 484b."

In *Arctic Engineering Corp. v. Harrison,* 272 Wis. 129, 136, 74 N.W.2d 627 (1956), we held that the following letter "reasonably informed" the plaintiff of the defendant's intention to claim damages for breach of contract: " 'The ice maker is not working we are having the same kind of trouble when your men were here. Meanwhile we have to buy ice every day which we are charging to your account, because it is up to you to do something, and do it fast.' "

In contrast to these situations, we deemed notice insufficient in *Marsh Wood Products Co. v. Babcock & Wilcox Co.,* 207 Wis. 209, 224–25, 240 N.W. 392 (1932). The facts in *Marsh* reveal that Marsh had a boiler rupture causing injury which it purchased from the Tube Company. Thereafter Marsh ordered twenty-eight new tubes from the Tube Company to replace the ruptured tube and

1964) ; Recent Decision, *Sales: What Constitutes Suffi-cient Notification for Breach of Warranty*, 47 Marq. L. Rev. 419, 421–23 (1963–1964) ; *See generally* Phillips, *Notice of Breach in Sales and Strict Tort Liability Law: Should There Be A Difference?*, 47 Ind. L. J. 457 (1972).

In the instant case, the plaintiffs, after they had attempted to dry three or four bins of corn, provided notice within approximately two months following installation of the facility that the grain drying equipment was not performing as expected. This was not unreasonable. *See* Note, *Notice of Breach and The Uniform Commercial Code, supra* at 538–40 ("courts balance the equities in determining what is a reasonable time for the giving of notice, and this time may vary considerably depending upon the facts and circumstances of the particular case"). *Id.* at 540.

The principal reason for requiring notice "is to enable the seller to make adjustments or replacements or to suggest opportunities for cure to the end of minimizing the buyer's loss and reducing the seller's own liability to the buyer." White and Summers, *supra* at 421. Other obvi-

others which it paid for and made no claim or complaint for breach of warranty. More than one year and eight months later, Marsh commenced suit against Tube—the first "notice" Tube received of the accident. *Id.* Under these facts, we concluded that it was immaterial whether Tube knew of the accident from another source; the buyer must inform the seller that he "is looking to him for damages." *Id.* at 225.

Under the cases we have cited, it is clear that Wisconsin does not utilize a different notice standard than the Code provides. Inherent in notice is the concept of reasonableness. The seller must be informed by the buyer that the buyer considers him (as opposed to others) responsible to remedy a troublesome situation. The Code seeks to eliminate an element of unfair surprise where a seller has not been informed that a situation is troublesome and, therefore, cannot take steps to correct it but only later has a lawsuit filed against him.

ous policies inherent in the notice requirement are to permit the seller to assist the buyer in minimizing the buyer's losses and to expedite the return of the goods to the seller before they have substantially depreciated. *See* Annot., 93 A.L.R.3d 363, 368 (1979).

In the instant case the record contains numerous instances where Olson and Super Steel went to the Paulson and Wachholz farm and attempted to alleviate the grain drying problems about which plaintiffs repeatedly complained. The defendants inspected the equipment, recommended increasing the drying temperature, Olson replaced a drying fan, and Super Steel's representative, Miller, installed a new drying floor facility.[9] It appears to us that the purpose of the notice provision, enabling the seller to cure the defect, has been effected. Only after the seller proved unable to remedy the situation did the plaintiffs commence the instant action. There is nothing in the record to indicate that the plaintiffs were not the good faith purchasers which the Uniform Commercial Code seeks to protect through liberal notice requirements. As we view the record, the defendants acknowledged the warranty and their responsibilities under it by attempting to repair the defects of which Paulson and Wachholz complained. *See Boeing Airplane Co. v. O'Malley, supra* (seller attempting to remedy a defect waives right to notice); *Southern California Enterprises, Inc. v. Walter & Co.,* 78 Cal. App. 2d 750, 760, 178 P.2d 785 (1947). Thus we hold that Paulson and Wachholz provided the requisite notice to the defendants in this action. *See Bonebrake v. Cox,* 499 F.2d 951, 956–57 (8th Cir. 1974); *Lewis v. Mobil Oil Corporation,* 438 F.2d 500, 509 (8th Cir. 1971) (notice sufficient where no bad faith claim against plaintiff asserted and re-

---

[9] The Uniform Commercial Code makes it clear, and the law is well established, that oral notice is sufficient. *See:* U.C.C. sec. 1–201(26) (1972).

peated complaints that "transaction was troublesome" were given) ; *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364, 379 (E.D. Mich. 1977) ; *Cf. Kopper Glo Fuel, Inc. v. Island Lake Coal Co.*, 436 F. Supp. 91, 97 (E.D. Tenn. 1977) (court held that favorable reports about product which greatly outnumbered complaints failed to provide proper notice of breach) ; *Marsh Wood Products Co. v. Babcock & Wilcox Co.*, 207 Wis. 209, 224, 240 N.W. 392 (1932) (where plaintiff commenced action twenty months after accident occurred and had ordered same product without complaint during that time; notice not properly given).

In summary, we have found privity of contract between the plaintiffs Paulson and Wachholz and defendant Super Steel by virtue of Super Steel's express warranty provided in its unilateral contract with the defendant. We further hold that the plaintiffs satisfied the notice requirements of the statutes.

*By the Court.*—The judgments of the trial court dismissing the defendants from this action are reversed, and the jury verdict against the defendants is reinstated.